**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRADLEY R. JOHNSON,
       *Plaintiff-Appellee,*

v.

POWAY UNIFIED SCHOOL DISTRICT;
JEFF MANGUM, individually and in
his official capacity as a Member
of the Board of Education for the
Poway Unified School District;
LINDA VANDERVEEN, individually
and in her official capacity as a
Member of the Board of
Education for the Poway Unified
School District; ANDREW PATAPOW,
individually and in his official
capacity as a Member of the
Board of Education for the Poway
Unified School District; TODD
GUTSCHOW, individually and in his
official capacity as a Member of
the Board of Education for the
Poway Unified School District;
PENNY RANFTLE, individually and
in her official capacity as a
Member of the Board of
Education for the Poway Unified
School District; DONALD A.
PHILLIPS, individually and in his
official capacity as Superintendent
of the Poway Unified School
District;

17321

DAWN KASTNER, individually and
in her official capacity as
Principal, Westview High School,
Poway Unified School District;
WILLIAM R. CHIMENT, individually
and in his official capacity as
Assistant Superintendent of the
Poway Unified School District,
                    *Defendants-Appellants.*

No. 10-55445

D.C. No.
3:07-cv-00783-
BEN-WVG

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
May 5, 2011—Pasadena, California

Filed September 13, 2011

Before: Barry G. Silverman, Richard C. Tallman, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Daniel R. Shinoff, Jack M. Sleeth, Jr. (argued), Paul V. Carelli, IV, Stutz Artiano Shinoff & Holtz, APC, San Diego, California, for defendants-appellants Poway Unified School District, et al.

Robert J. Muise (argued), Thomas More Law Center, Ann Arbor, Michigan, and Charles S. LiMandri, Law Offices of Charles S. LiMandri, Rancho Santa Fe, California, for plaintiff-appellee Bradley R. Johnson.

Francisco M. Negron, Jr., National School Boards Association, Alexandria, Virginia, and Thomas E.M. Hutton, Patterson Buchanan Fobes Leitch & Kalzer, Inc., P.S., Seattle, Washington, for Amicus Curiae National School Boards Association and California School Boards Association in Support of defendants-appellants Request for Reversal.

Ayesha N. Khan, Michael A. Blank, Americans United for Separation of Church and State, Washington, D.C., for Amicus Curiae Americans United for Separation of Church and State in Support of appellants.

David Blair-Loy, ACLU Foundation of San Diego and Imperial Counties, San Diego, California, for Amicus Curiae American Civil Liberties Union of San Diego and Imperial Counties in Support of plaintiff-appellee and Affirmance with Modification of Judgment.

Steven W. Fitschen, The National Legal Foundation, Virginia Beach, Virginia, for Amici Curiae Christian Educators Association International and WallBuilders, Inc., in Support of plaintiff-appellee Urging Affirmance.

---

## OPINION

TALLMAN, Circuit Judge:

We consider whether a public school district infringes the First Amendment liberties of one of its teachers when it orders him not to use his public position as a pulpit from which to preach his own views on the role of God in our

Nation's history to the captive students in his mathematics classroom. The answer is clear: it does not.

When Bradley Johnson, a high school calculus teacher, goes to work and performs the duties he is paid to perform, he speaks not as an individual, but as a public employee, and the school district is free to "take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Just as the Constitution would not protect Johnson were he to decide that he no longer wished to teach math at all, preferring to discuss Shakespeare rather than Newton, it does not permit him to speak as freely at work in his role as a teacher about his views on God, our Nation's history, or God's role in our Nation's history as he might on a sidewalk, in a park, at his dinner table, or in countless other locations.

Because we further conclude that the school district did not violate Johnson's rights under either the Establishment or Equal Protection clauses of the United States Constitution, as applied by the Fourteenth Amendment,[1] we reverse the district court's award of summary judgment to Johnson and remand with instructions to enter summary judgment in favor

---

[1]The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Section 1 of the Fourteenth Amendment provides, in relevant detail:

> No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

"The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995).

of the Poway Unified School District and its officials on all federal and state claims.[2]

# I

Bradley Johnson has spent more than 30 years teaching math to the students of the Poway Unified School District of San Diego County, California. In August 2003, he moved to the newly opened Westview High School to teach calculus and algebra. He teaches there still and is the faculty sponsor of the school's student Christian club.

In late 2006, a fellow teacher at Westview set this action in motion when he questioned Dawn Kastner, the newly hired principal of Westview, about two large banners prominently displayed in Johnson's classroom. Kastner, who had also heard about Johnson's banners from a student and another teacher, went to Johnson's classroom to see the banners for herself. What she found surprised her. In Johnson's classroom, two large banners, each about seven-feet wide and two-feet tall, hung on the wall. *See* Appendix. One had red, white, and blue stripes and stated in large block type: "IN GOD WE TRUST"; "ONE NATION UNDER GOD"; "GOD BLESS AMERICA"; and, "GOD SHED HIS GRACE ON THEE."[3] The other stated: "All men are created equal, they are endowed by their CREATOR." On that banner, the word "creator" occupied its own line, and each letter of "creator" was capitalized and nearly double the size of the other text.

Kastner recalled being overwhelmed by the size of the banners. She remembered walking into Johnson's class "and

---

[2]We resolve these state law claims against Johnson and reverse the district court in a separate memorandum disposition filed concurrently with this opinion.

[3]Each of these phrases appears in official and historical texts. For example, "In God We Trust" is the official motto of the United States, and "One Nation Under God" is a line from the Pledge of Allegiance.

going, 'Wow, these are really big.' " She was more concerned, though, about the message. "It was a math class," she later explained. "There were a lot of phrases that individually or in context were not problematic at all. But because they were taken out of context and very large, they became a promotion of a particular viewpoint"—a religious viewpoint "that might make students who didn't share that viewpoint uncomfortable." The "common thread in all of those were the words 'God, Creator.' Those were all sort of pulled out of the context of their original [meaning] — and the signs were, like, 10 feet, 7 feet, something like that. There were two very large signs."

Unsure as to what she should do, Kastner called Melavel Robertson, one of Poway's assistant superintendents. She described the banners to Robertson and told her that "some people [had] mention[ed] that they don't know why these signs are allowed in the classroom, and I just saw what they're talking about." At Robertson's request, she had pictures taken of Johnson's banners and sent to Robertson, who forwarded them to Bill Chiment, the assistant superintendent tasked with "legal issues."

While waiting for further direction from the superintendent's office, Kastner met with Johnson to talk about his banners. She told him that she felt the signs might inappropriately emphasize the words "God" and "Creator" and suggested that his displays might be more appropriate if the passages were each displayed in the context of the historical artifact or document from which they were pulled. "We talked about the possibility of putting the entire thing up in context so if a phrase was from the Declaration [of Independence], put the entire Declaration up." Also, "we talked about taking a smaller version of that and having smaller — smaller expressions of his personal beliefs around his desk area."

Kastner asked Johnson to consider how a student of a different faith might feel if they walked into his classroom and

saw his banners. "[T]hey may feel like, 'Wow, I'm not welcome,' or 'I'm not gonna fit in this classroom.' And they may feel bad. And I can't imagine that that would ever be your intent." Johnson was not convinced. According to Kastner, he told her, "Dawn, sometimes that's necessary," and refused to either remove his banners or display the more contextual versions the school offered to provide.[4] He explained that he had displayed the banners in some form or another since 1982, that they simply contained patriotic phrases, and that he considered it his "right to have them up."

After the meeting with Johnson, Kastner spoke with Chiment and informed him of their discussion. Eventually, the full school board approved the decision to order Johnson to remove the banners. On January 19, 2007, Chiment phoned Johnson and told him that he would need to remove his banners. Four days later, Chiment followed up his phone call with a letter directing Johnson to review Poway Unified School District Administrative Procedure 3.11.2, "The Teaching of Controversial Issues," as well as California Education Code § 51511.[5] He told Johnson to pay particular care to Poway's requirement that teachers "[f]ollow the requirements on prohibited instruction as contained in the California Education Code" and "[d]istinguish between teaching and advocating, and refrain from using classroom teacher influence to promote partisan or sectarian viewpoints."

---

[4]For example, the school offered to provide, and did provide, Johnson with a large poster of a quarter that displayed the phrase "In God We Trust" in context.

[5]That section provides:

> Nothing in this code shall be construed to prevent, or exclude from the public schools, references to religion or references to or the use of religious literature, dance, music, theatre, and visual arts or other things having a religious significance when such references or uses do not constitute instruction in religious principles or aid to any religious sect, church, creed, or sectarian purpose and when such references or uses are incidental to or illustrative of matters properly included in the course of study.

Chiment explained that the "prominent display of these brief and narrow selections of text from documents and songs without the benefit of any context and of a motto, all of which include the word 'God' or 'Creator' has the effect of using your influence as a teacher to promote a sectarian viewpoint." He added that these uses also constituted "aid to a particular religious sect, creed, or sectarian purpose" because they were "not incidental or illustrative of matters properly included in your course of study as a teacher of mathematics."

Johnson complied with the district's order and removed his banners. Shortly thereafter, he filed suit in federal court, alleging that Poway had violated his rights under the First and Fourteenth amendments of the United States Constitution, and article I, sections 2 and 4, of the California Constitution. He sought declaratory and injunctive relief.

After the lawsuit was filed, Johnson conducted site inspections at all four high schools in the school district. He identified and photographed a lengthy list of items he believed displayed sectarian viewpoints, including Tibetan prayer flags; a John Lennon poster with "Imagine" lyrics; a Mahatma Gandhi poster; a poster of Gandhi's "7 Social Sins"; a Dalai Lama poster; a poster that says, "The hottest places in hell are reserved for those who in times of great moral crisis, maintain their neutrality"; and a poster of Malcolm X.[6] Both parties also deposed school officials, including Kastner and Chiment, and some teachers, including Johnson. In his deposition, Johnson initially maintained that his banners were purely patriotic with no religious purpose. When pressed, however, he stated:

> My purpose was to celebrate our national heritage of — and the national motto saying the Pledge of Allegiance. I know that there's — you know, is it God

---

[6]We identify only those materials that could possibly be construed as religious. The remaining displays are ultimately immaterial to our inquiry.

> or is it — or is there no God. If that's the choice, then this is espousing God as opposed to no God, I'll say that, but not any particular God.

He later added, in regard to his selections, "I'm not intending to highlight or promote any of that kind of religious background because I don't know what it was. I'm trying to highlight the religious heritage and nature of our nation, that we have that as a foundation."

On August 14, 2009, cross-motions for summary judgment were filed. On February 25, 2010, the district court granted Johnson summary judgment on each of his claims. It concluded that Poway had created a limited public forum for teacher speech in its classrooms and had impermissibly limited Johnson's speech based upon his viewpoint. It granted Johnson declaratory relief and ordered Poway not to interfere with Johnson's future display. It also found that the school officials were not entitled to qualified immunity and ordered each to pay nominal damages. Johnson later moved for attorney's fees in the amount of $240,563.15. That motion has been stayed pending the outcome of Poway's timely appeal.

## II

We have jurisdiction under 28 U.S.C. § 1291, and we review de novo the district court's grant of summary judgment to "determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002). Because the parties filed cross-motions for summary judgment, we consider each party's evidence to evaluate whether summary judgment was appropriate. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### III

We consider the district court's determination that Poway violated Johnson's rights under the Free Speech and Establishment clauses of the First Amendment, as well as his equal protection rights under the Fourteenth Amendment.

### A

We address first whether the district court erred in holding that Poway violated Johnson's federal free speech rights when it ordered that he no longer display his banners in his classroom.

In undertaking this inquiry, we consider whether the court erred in applying a pure forum-based analysis rather than the *Pickering*-based inquiry crafted by the Supreme Court to measure the constitutionality of the government's curtailment of government-employee speech. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). Because we hold that *Pickering*'s employee-speech analysis controls, we further consider whether Poway's actions ran afoul of the sequential five-step *Pickering*-based test we adopted in *Eng v. Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009). As we can conceive of no basis for concluding that Johnson's speech was protected, we reverse the district court's award of summary judgment on this issue and remand with instructions to enter judgment in favor of Poway.

### 1

**[1]** To some degree, we can understand the district court's mistake. An analysis of the government's regulation of speech ordinarily hinges on the context, or forum, in which the

speech takes place. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44-46 (1983). Under that traditional rubric, the government's power is at its least when speech takes place in a public forum, is greater when it is regulating speech in a limited public forum, and is at its greatest when regulating speech in a non-public forum. *Id.*

**[2]** However, the Supreme Court has held that where the government acts as both sovereign *and employer*, this general forum-based analysis does not apply. *Pickering*, 391 U.S. at 568; *accord Garcetti v. Ceballos*, 547 U.S. 410, 417-19 (2006); *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004) ("[A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."). Instead, the Court applies a distinct *Pickering*-based analysis that "reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *Roe*, 543 U.S. at 82.

As initially described in *Pickering*, this analysis required only that courts balance " 'the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Eng*, 552 F.3d at 1070 (alteration in original) (quoting *Pickering*, 391 U.S. at 568). Since *Pickering*, however, the test has evolved. *See, e.g.*, *Ceballos*, 547 U.S. at 423-24, 426 (speech must not be made pursuant to duties as employee); *Roe*, 543 U.S. at 82-83 ("speech must touch on a matter of 'public concern' " (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977) (causation). We have distilled this evolution into a "sequential five-step" inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private

citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng*, 552 F.3d at 1070. Notably, "because these are sequential steps," a plaintiff's failure to satisfy a single one "necessarily concludes our inquiry." *Huppert v. City of Pittsburg*, 574 F.3d 696, 703 (9th Cir. 2009).

Despite *Pickering* and its progeny, the district court concluded that "the *Pickering* balancing test for government employee speech is the wrong test to apply" to measure the legality of Poway's actions. *Johnson v. Poway Unified Sch. Dist.*, No. 3:07-cv-783-BEN-WVG, 2010 WL 768856, at *8 (S.D. Cal. Feb. 25, 2010). It rested this conclusion on a single fact—that Johnson's speech occurred *in school*, noting " '[i]t can hardly be argued that either students *or teachers* shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' " *Id.* at *7 (alteration in original) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (emphasis added)). On appeal, Johnson urges us to follow suit. We decline his invitation.

**[3]** Contrary to Johnson's belief and the district court's determination, no justifiable cause exists for refusing to apply our *Pickering*-based analysis to Johnson's claim. *See Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (applying *Pickering*) ("Casting these red herrings aside, we look instead to applicable doctrine, which is found in the case law governing employee speech in the workplace."); *see also Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649-50 (9th Cir. 2006) (rejecting an employee's contention that a "stricter test" than our *Pickering*-based analysis should apply when the

underlying speech is religious); *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1016 (9th Cir. 2000).[7] First, our "school speech" precedent in no way suggests that *Pickering* does not control in cases of in-school teacher speech. Not one of those cases relied upon by the district court applied a *Pickering*-based analysis because not one involved a government employee—a fact that renders *Pickering*'s absence not only unsurprising, but necessary. *Compare Johnson*, 2010 WL 768856, at *8 (citing cases), *with Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (student journalists); *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 648-49 (9th Cir. 2008) (student Bible club), *overruled on other grounds by L.A. Cnty., Cal. v. Humphries*, 131 S. Ct. 447 (2010); *Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007) (student); *and Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1048-50 (9th Cir. 2003) (per curiam) (religious non-profit corporation).

*Pickering* and *Tinker* are not mutually exclusive concepts. *Tinker*, 393 U.S. at 506 ("First Amendment rights, *applied in light of the special characteristics of the school environment*, are available to teachers and students." (emphasis added)). The very basis for undertaking a *Pickering*-based analysis of teacher speech, whether in-class or out, is the Court's recognition that teachers do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering*, 391 U.S. at 568. That much should be evident from the test itself,

---

[7]Johnson argues that *Downs* is immaterial to a *Pickering*-based inquiry. We disagree. *Downs* recognized that the threshold inquiry in employee-speech cases is whether the citizen or the government was speaking. *Downs*, 228 F.3d at 1011-12 ("Rather than focusing on what members of the public might perceive Downs's speech to be, in this case we find it more helpful to focus on who actually was responsible for the speech . . . ."). Six years later, the Court did the same in *Ceballos*. 547 U.S. at 421. Because we now undertake that very inquiry under step two of *Eng*, *see* 552 F.3d at 1070, *Downs* is not only relevant, it largely controls.

which requires that we "balance between *the interests of the teacher*, as a citizen, . . . and the interest of the State." *Id.* (emphasis added); *accord Ceballos*, 547 U.S. at 418 (noting that absent a First Amendment right there can be no First Amendment claim).

Thus, to do as Johnson suggests would require us to ignore that *Pickering* itself concerned a school district's attempt to curtail the out-of-school speech of a high school teacher. 391 U.S. at 564, 568. It would require us to forget the very rationale undergirding the Court's creation of the *Pickering* doctrine: that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," or else "there would be little chance for the efficient provision of public services." *Ceballos*, 547 U.S. at 418 (citing *Connick*, 461 U.S. at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter.")). It would require that we somehow conclude that a teacher's in-school speech warrants greater protection than his or her out-of-school speech—a proposition directly at odds with the common understanding of *Pickering* and its progeny. *Id.* at 423-24 (explaining that "public statements" made "outside the course of performing . . . official duties" engender the greatest "First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government"); *see Downs*, 228 F.3d at 1016.

Moreover, addressing similar claims in similar contexts, we have refused to unnecessarily narrow *Pickering*'s application. *Berry*, 447 F.3d at 649 (declining to apply a forum-based analysis to evaluate the government's curtailment of an employee's religious speech "because [the forum analysis] does not take into consideration the employer's interests that led the Supreme Court to adopt the *Pickering* balancing test in the first place."); *id.* at 650 ("Here, Mr. Berry contends that his speech is protected under the First Amendment as religious speech, rather than as comments upon matters of public

concern. Nonetheless, we conclude that the *Pickering* balancing approach applies regardless of the reason an employee believes his or her speech is constitutionally protected."); *Tucker*, 97 F.3d at 1210.

So too have our sister circuits. When addressing claims concerning in-school teacher speech, each has applied *Pickering* to measure the constitutionality of the government's conduct. *E.g.*, *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340 (6th Cir. 2010); *Borden v. Sch. Dist. of East Brunswick*, 523 F.3d 153, 171 (3d Cir. 2008) (holding under *Pickering*-based analysis that school could prohibit faculty participation in student-initiated prayer); *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007) (holding under a *Pickering*-based analysis that a school board did not infringe the rights of a teacher when it ordered him to remove religious material from a classroom bulletin board); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479-80 (7th Cir. 2007) (applying *Pickering*-based test and holding that "the [F]irst [A]mendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system"). We see no reason to depart from their company.

[4] In sum, we think it plain that the appropriate guide for measuring the legality of the government's curtailment of employee speech in the workplace, including that of teachers, would be that Supreme Court "case law governing employee speech in the workplace." *See Tucker*, 97 F.3d at 1210 (citing *Pickering*); *see also Downs*, 228 F.3d at 1012, 1015. The district court erred by declining to apply the controlling *Pickering*-based analysis.

**2**

Having identified the *Pickering*-based approach as the appropriate standard by which to measure Poway's conduct, we apply our five-step *Pickering*-based analysis to determine whether Poway violated Johnson's federal free speech rights when it ordered that he remove his banners from his classroom.[8]

Applying that standard, we conclude that there is no legitimate question as to whether the school violated Johnson's rights—it did not. *Downs*, 228 F.3d at 1016; *see Evans-Marshall*, 624 F.3d at 340; *Mayer*, 474 F.3d at 479-80; *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 491 (3d Cir. 1998) ("[A]lthough a teacher's out-of-class conduct, including her advocacy of particular teaching methods, is protected, her in-class conduct is not." (citation and internal quotation marks omitted)); *see also Borden*, 523 F.3d at 171; *Lee*, 484 F.3d at 700. Though we do not lightly conclude that Johnson surpasses *Eng*-step one, "(1) whether the plaintiff spoke on a matter of public concern," 552 F.3d at 1070, we recognize that our hesitation is driven not by the nature of the speech itself but by the "in-school" setting and opportunity for that speech. These concerns underlie our inquiry under *Eng*-step two, "(2) whether the plaintiff spoke as a private citizen or public employee," *id.* at 1071 (relying on *Ceballos*, 547 U.S. at 423-24), and lead us to conclude that Johnson spoke as an employee, not as a citizen. Accordingly, we climb no further. *Huppert*, 574 F.3d at 703 ("[F]ailure to meet one [step] necessarily concludes our inquiry.").

---

[8]Ordinarily, we would remand the matter to allow the district court to first pass on the issue. However, because the record fails to establish any genuine issues of material fact that would preclude us from resolving the legal questions presented under our *Eng* analysis, and because the parties briefed and argued the issue, we are adequately informed and think it expedient to resolve the matter. *See Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991, 995 (9th Cir. 2000).

**a**

**[5]** Under *Eng*, Johnson must first demonstrate that his banners "touched upon a matter of public concern." *Connick*, 461 U.S. at 149; *Eng*, 552 F.3d at 1070.

This inquiry "is one of law, not fact." *Connick*, 461 U.S. at 148 n.7. And our aim, at least in theory, is simple: to determine whether the content of the employee's speech is sufficiently important to the public that its curtailment "warrant[s] judicial review." *Berry*, 447 F.3d at 649; *accord Roe*, 543 U.S. at 82-83.

To put theory into practice, we undertake a "generalized analysis of the nature of the speech." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009); *see Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001) (declining to adopt "rigid multi-part tests that would shoehorn communication into ill-fitting categories"). Under that analysis, we consider generally "the content, form, and context of a given statement, as revealed by the whole record," *id.* (quoting *Connick*, 461 U.S. at 147-48), to ascertain whether speech "fairly can be said to relate to 'any matter of political, social, or other concern to the community,' " *Huppert*, 574 F.3d at 703 (quoting *Connick*, 461 U.S. at 147-48).

Of the three concerns, content is king. *Desrochers*, 572 F.3d at 710. It is "the greatest single factor in the *Connick* inquiry," *id.*, and our primary concern. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 386-87 (1987); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414-16 (1979).[9] Form and

---

[9]In *Rankin*, for example, the Court concluded that the private form of an employee's speech—that the employee had spoken to a co-worker during work hours in an informal and private manner—could not negate the inherently public character of her political speech. 483 U.S. at 386-87; *accord Roe*, 543 U.S. at 84 ("[C]ertain private remarks, such as negative comments about the President of the United States, touch on matters of

context only truly inform our legal inquiry in those "close" cases where "the subject matter of a statement is only marginally related to issues of public concern." *Desrochers*, 572 F.3d at 710 *(quoting Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995)). In those cases, "the fact that [a statement] was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (quoting *Multnomah Cnty.*, 48 F.3d at 425).

**[6]** In the present case, our crowning of content is dispositive. *Desrochers*, 572 F.3d at 710; *see Rankin*, 483 U.S. at 386-87. Though Johnson maintains that his banners express purely patriotic sentiments—that they concern "well-known historical, patriotic phrases and slogans central to our Nation's history"—it seems as plain to us as it was to school officials that Johnson's banners concern religion. As Johnson conceded at his deposition, "[T]his is discussing God as opposed to no God . . . . I'm trying to highlight the religious heritage and nature of our nation, that we have that as a foundation." Moreover, his after-the-fact statements merely reinforce the obvious. One would need to be remarkably unperceptive to see the statements "IN GOD WE TRUST," "ONE NATION UNDER GOD," "GOD BLESS AMERICA," "GOD SHED HIS GRACE ON THEE," and "All men are created equal, they are endowed by their CREATOR," *as*

public concern and should thus be subject to *Pickering* balancing" regardless of the manner in which they were conveyed. (discussing *Rankin*)). Similarly, in *Givhan*, the Court rejected the assertion that Mrs. Givhan, a public high school teacher, had forfeited her First Amendment interest in her speech protesting "racial discrimination—a matter inherently of public concern," *Connick*, 461 U.S. at 148 n.8—simply because she "arrange[d] to communicate privately with h[er] employer rather than to spread h[er] views before the public." 439 U.S. at 414-16.

*organized and displayed by Johnson* and not understand them to convey a religious message.[10] *See* Appendix.

[7] Because speech concerning religion is unquestionably of inherent public concern, *Tucker*, 97 F.3d at 1212-13; *see Connick*, 461 U.S. at 144 ("[I]t [i]s already 'too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.' " (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963))), our inquiry under *Eng* step one is concluded, and we climb to the second step of *Eng*.[11]

---

[10]To be clear, we do not hold that these phrases necessarily equate to speech concerning religion in and of themselves. *See, e.g.*, *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1019-20 (9th Cir. 2010) (holding that the phrase, "under God," did not render the Pledge of Allegiance unconstitutional because "[w]e must examine the Pledge as a whole" to take account of context). Organized differently, such as in the context of their historical significance, these terms may well lack any overt religious import, *id.*—a reality Poway itself recognized when it offered to provide Johnson substitute posters. However, the bare fact that Johnson pulled each phrase from a non-religious historical text does not categorically preclude us from concluding that he used these otherwise innocuous phrases to convey a religious message. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 129 S. Ct. 1125, 1136 (2009). And it is *his* organization and *his* selected emphasis on the words "God" and "Creator" that drive our conclusion that the banners concerned religion. *See Connick*, 461 U.S. at 148 n.7.

[11]We decline Poway's invitation to apply the curricular speech doctrine in this case. *See generally Lee*, 484 F.3d at 697 (explaining that the threshold inquiry for "curricular speech" is whether the speech "constitute[s] school-sponsored expression bearing the imprimatur of the school"). As we will explain shortly in greater detail, this "is not a case involving the risk that a private individual's private speech might simply 'bear the imprimatur' of the school or be perceived by outside individuals as 'school-sponsored.' " *Downs*, 228 F.3d at 1011. "Instead, we face an example of the government opening up its own mouth" to speak through the mouthpiece of one of its employees—a categorically different situation because, as *Downs* explains, we "review [a school's] actions through a viewpoint neutrality microscope" in imprimatur cases, *id.* at 1012, but not " 'when the State is the speaker,' " *id.* at 1013 (quoting *Rosenberger*, 515 U.S. at 833).

**b**

**[8]** The second *Eng* step requires Johnson to show that he "spoke as a private citizen," not as a "public employee." *Eng*, 552 F.3d at 1070-71.[12]

Two inquiries are necessary to resolve this mixed question of law and fact. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). First, a factual determination must be made as to the "scope and content of a plaintiff's job responsibilities." *Eng*, 552 F.3d at 1071. In undertaking this inquiry, courts are not to rely mechanically on formal or written job descriptions, which "often bear little resemblance to the duties an employee actually is expected to perform." *Ceballos*, 547 U.S. at 424-25. "The proper inquiry is a practical one." *Id*. at 424.

Second, the "ultimate constitutional significance" of those facts must be determined as a matter of law. *Eng*, 552 F.3d at 1071 (citations and internal quotation marks omitted). If Johnson spoke as any ordinary citizen might, then our inquiry continues. *Ceballos*, 547 U.S. at 419. But if Johnson's speech "owes its existence" to his position as a teacher, then Johnson spoke as a public employee, not as a citizen, and our inquiry is at an end. *Id.* at 421-22 (The First Amendment "does not invest [government employees] with a right to perform their jobs however they see fit."); *Evans-Marshall*, 624 F.3d at 340 (concluding that when teacher speaks as a government employee "the school board that hires that speech . . . can surely 'regulate the content of what is or is not expressed' " (quoting *Rosenberger*, 515 U.S. at 833 (The government

---

[12]We reject the contention that *Eng* step two, which is derived from *Ceballos*, does not apply to inquiries regarding teacher speech. As the Sixth Circuit recognized in *Evans-Marshall*, *Ceballos*'s "academic freedom" carve-out, 547 U.S. at 425, applied to teachers at "public colleges and universities," *id.* at 438 (Souter, J., dissenting), not primary and secondary school teachers. 624 F.3d at 342-44; *see Edwards v. Aguillard*, 482 U.S. 578, 584 n.5 (1987).

retains the power to "regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.")); *see Downs*, 228 F.3d at 1013 ("Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist.").

Our factual issue is not in dispute. Johnson does not hold a unique or exotic government position. As found by the district court, he is a math teacher who performs the ordinary duties of a math teacher. *Johnson*, 2010 WL 768856, at *2. In addition, Johnson did not make his speech while performing a function not squarely within the scope of his position.[13] He was not running errands for the school in a car adorned with sectarian bumper stickers or praying with people sheltering in the school after an earthquake. "Rather, Johnson hung his banners pursuant to a long-standing Poway Unified School District policy, practice, and custom," *id.*, of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator.

**[9]** More importantly, we recognize that "[e]xpression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Mayer*, 474 F.3d at 479; *Evans-Marshall*, 624 F.3d at 340. Thus, *as a practical matter*, we think it beyond possibility for fairminded dispute that the "scope and content of [Johnson's] job responsibilities" did not include speaking to his class in his classroom during class hours. *Cf. Ceballos*, 547 U.S. at 424.

---

[13]We acknowledge that the district court determined that the banners were not part of Johnson's curriculum. This finding is irrelevant, however, to the question of whether Johnson spoke as a citizen or as an employee. *Downs*, 228 F.3d at 1015 ("Whether or not the bulletin boards by themselves may be characterized as part of the school district's 'curriculum' is unimportant, because curriculum is only one outlet of a school district's expression of its policy."); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522-23 (9th Cir. 1994).

**[10]** We consider next our legal inquiry: whether Johnson's speech owes its existence to his position, or whether he spoke just as any non-employee citizen could have. The answer is clear; he spoke as an employee. *Downs*, 228 F.3d at 1015; *see also Peloza*, 37 F.3d at 522-23. Certainly, Johnson did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee. *Cf. Ceballos*, 547 U.S. at 422 ("Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. . . . When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee."). Similarly, Johnson did not act as an ordinary citizen when "espousing God as opposed to no God" in his classroom. *Peloza*, 37 F.3d at 522-23; *Mayer*, 474 F.3d at 479-80 ("The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials."); *see Lee*, 484 F.3d at 695.

As we recognized in *Peloza*,[14] teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction. *Peloza*, 37 F.3d at 522; *see Downs*, 228 F.3d at 1015. Rather, because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence

---

[14]We are not persuaded by the district court's attempt to distinguish *Peloza*. Though it is true that *Peloza* only barred religious speech during "instructional time," *Johnson*, 2010 WL 768856, at *16, the court accepted the school district's expansive definition of "instructional time," i.e., "any time students are required to be on campus as well as the time students immediately arrive for the purposes of attending school for instruction, lunch time, and the time immediately prior to students' departure after the instructional day." *Peloza*, 37 F.3d at 522. The setting for Johnson's speech fell well within that expansive definition.

of students, in a capacity one might reasonably view as official.[15] *Peloza*, 37 F.3d at 522; *Tucker*, 97 F.3d at 1210, 1212-13 ("A teacher appears to speak for the state when he or she teaches; therefore, the department may permissibly restrict such religious advocacy.")[16]; *see Aguillard*, 482 U.S. at 584 ("The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure."); *Downs*, 228 F.3d at 1015; *see also Berry*, 447 F.3d at 651-52 (discussing displays in public areas of government offices).

[11] An ordinary citizen could not have walked into Johnson's classroom and decorated the walls as he or she saw fit, anymore than an ordinary citizen could demand that students remain in their seats and listen to whatever idiosyncratic perspective or sectarian viewpoints he or she wished to share. *See Peloza*, 37 F.3d at 522-23; *Mayer*, 474 F.3d at 479-80; *Lee*, 484 F.3d at 695. Unlike Pickering, who wrote a letter to his local newspaper as any citizen might, 391 U.S. at 564, or Givhan, who met with her school's principal, a fellow employee who willingly "opened his office door to" her speech, 439 U.S. at 415, Johnson took advantage of his position to press his particular views upon the impressionable and "captive" minds before him. *See Aguillard*, 482 U.S. at 583-84; *Tucker*, 97 F.3d at 1203.

---

[15]We emphasize that teachers may still speak as government employees if fewer than all three conditions are met.

[16]In *Tucker*, we concluded that the California Department of Education had impermissibly curtailed the First Amendment rights of one of its computer analysts, an employee with "no educational function whatsoever" or any interaction with the public, when it precluded him from discussing his religious beliefs at work. 97 F.3d at 1208, 1212-13. We concluded, however, that the result of our *Pickering*-based analysis would have been wholly different had the department's decision "applied to teachers acting in their role as teachers, or to department employees addressing the public in their official capacities." *Id.* at 1213; *see Berry*, 447 F.3d at 650, 652.

Finally, as *Downs* demonstrates, we need not reach a different conclusion simply because Poway allows its teachers some freedom in decorating their classrooms. 228 F.3d at 1011-12. *In Downs*, high school teachers and other staff members created a bulletin board in a school hallway on which staff could post, pursuant to a school board policy, materials related to "Gay and Lesbian Awareness Month." *Id.* at 1006. Like Poway's policy for classroom decoration, "[m]aterials did not need approval before posting on the Gay and Lesbian Awareness bulletin boards, but were subject to the oversight of the school principal, who had ultimate authority within the school over the content of the boards." *Id.* Also like Poway's policy, the school policy at issue in *Downs* permitted only faculty and staff to post materials, but allowed "[m]aterials . . . cover[ing] a wide range of topics" to be posted. *Id.*

Dissatisfied with the materials being posted by his co-workers, Downs decided to counteract their message by hanging a competing bulletin board on which he posted his own anti-homosexual materials. *Id.* at 1006-07. After his co-workers complained, the school district ordered that he remove his board and materials. *Id.* at 1007. Like Johnson, Downs sued. *Id.* at 1008.

**[12]** On appeal, we quickly cast aside Downs's contention, echoed by Johnson today, that the school had created a limited public forum either by allowing teachers to post materials of their choosing or by not "strictly policing" those materials posted and had thus relinquished its right to restrict the viewpoints expressed.[17] *Id.* at 1011-12; *Tucker*, 97 F.3d at 1209.[18]

---

[17]This contention is also repudiated by the fact that Johnson and his co-workers are all employees of the school and therefore not members of the "public." *Perry*, 460 U.S. at 47 (rejecting the argument that a limited-public forum had been created because the school had not "opened its mail system for indiscriminate use by the general public" but rather had permitted only entities "affiliated with the schools" to use the system).

[18]In *Tucker*, the Court flatly rejected the contention that a public forum could be created through mere inaction:

We concluded that it would be better "to focus on who actually was responsible for the speech on Leichman High's . . . bulletin boards": the government. *Downs*, 228 F.3d at 1011-12.

> Only school faculty and staff had access to post materials on these boards. While these faculty and staff members may have received materials from outside organizations, the faculty and staff members alone posted material on the bulletin boards, and at all times their postings were subject to the oversight of the school principals. Although much, if not all, of what Downs posted appeared on the bulletin board directly across the hall from his assigned classroom, the proximity of the board to his classroom detracts in no way from the conclusion that the bulletin board, like all others in Leichman High's halls, were the property and responsibility of Leichman High and LAUSD. That Leichman High's principals do not spend the majority of their days roaming the school's halls strictly policing—or, in Downs's point of view, censoring—the school's bulletin boards does not weaken our conclusion that there is no genuine issue of material fact concerning whether [the principals] had the authority to enforce and give voice to school district and school board

In *Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 802 . . . (1985), the Court stated, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional forum for public discourse." (emphasis added). Assuming that Tucker and his co-workers talked about whatever they wanted to at work (before the passage of the challenged order), and that they posted all sorts of materials on the walls, that still would not show that the government had intentionally opened up the workplace for public discourse.

97 F.3d at 1209.

policy. Inaction does not necessarily demonstrate a lack of ability or authority to act.

\* \* \*

We do not face an example of the government opening up a forum for either unlimited or limited public discussion. Instead, we face an example of the government opening up its own mouth . . . .

*Id.* at 1011-12. Accordingly, the board could " 'take legitimate and appropriate steps to ensure that its message [wa]s neither garbled nor distorted' by its individual messengers," including ordering Downs to curtail his speech. *Id*. at 1011, 1013 (quoting *Rosenberger*, 515 U.S. at 833 ("[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.")). We see no reason why the logic of *Downs* should not apply in the present case.[19] Johnson spoke as an employee, not as a citizen.

[13] In sum, nothing in our holding today prevents Johnson from himself propounding his *own opinion* on "the religious heritage and nature of our nation" or how "God places prominently in our Nation's history." "Subject to any applicable forum analysis, he may [generally] do so on the sidewalks,

---

[19]We again disagree with the district court's treatment of our controlling case law. Not all the materials posted on the bulletin boards in *Downs* "were supplied by the school district," and Downs did not post his materials on boards provided and erected by the school. 228 F.3d at 1006, 1011 ("Downs created his own bulletin board"). *Contra Johnson*, 2010 WL 768856, at \*17.

Moreover, even if true, these forced distinctions are immaterial. So long as it is still the school's walls being adorned and the school's charges being indoctrinated, the school acts well within its power. *Berry*, 447 F.3d at 651 ("[T]he government 'has a greater interest in controlling what materials are posted on its property than it does in controlling the speech of the people who work for it.' " (quoting *Tucker*, 97 F.3d at 1214)); *Peloza*, 37 F.3d at 522; *Lee*, 484 F.3d at 695.

in the parks, through the chat-rooms, at his dinner table, and in countless other locations." *Id.* at 1016 (citing *Rust v. Sullivan*, 500 U.S. 191, 198 (1991)). "He may not do so, however, when he is speaking as the government, unless the government allows him to be its voice." *Id.*; *see Pleasant Grove*, 129 S. Ct. at 1131 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). Because the speech at issue owes its existence to Johnson's position as a teacher, Poway acted well within constitutional limits in ordering Johnson not to speak in a manner it did not desire. *Ceballos*, 547 U.S. at 421-22; *Downs*, 228 F.3d *at 1013 (citing Rosenberger*, 515 U.S. at 833); *Peloza*, 37 F.3d at 522-23.

**B**

If the displays at issue in this case did not concern religion, our identification of the speech as the government's would end our inquiry. *Ceballos*, 547 U.S. at 421-22. As we have discussed, the Free Speech Clause "has no application" to government speech, *Pleasant Grove,* 129 S. Ct. at 1131, and, as we will discuss, individuals like Johnson have no personal interest in government speech on which to base an equal protection claim, *Downs*, 228 F.3d at 1017; *see Ceballos*, 547 U.S. at 421-22. In regard to those claims, the bare fact that the speech belongs to the government is dispositive.

The same cannot be said for the Establishment Clause, however. That Clause *does* apply to government speech. *E.g.*, *Pleasant Grove*, 129 S. Ct. at 1131-32 (noting that the "involvement of public officials in advocacy may be limited by law, regulation, or practice," including the Establishment Clause). And thus the government could run afoul of the Clause either through its speech, *id.*, or, as argued by Johnson, through its act to curtail its speech—in this case, the display of the banners,[20] *see Vasquez v. L.A. Cnty.*, 487 F.3d 1246,

---

[20]To be clear, Johnson and amici err in asserting that Poway could only curtail Johnson's display if the banners violated the Establishment Clause. In fact, the opposite is true. Poway may freely curtail its own speech unless *that curtailment* runs afoul of the Establishment Clause.

1247-48, 1254-58 (9th Cir. 2007) (evaluating whether the removal of a cross from the Los Angeles County seal "conveyed a state-sponsored message of hostility toward Christians" in contravention of the Establishment Clause). In short, as Johnson complains, that Poway's "policy, practice, and/or custom, of prohibiting [the] banners," while permitting other displays,[21] "conveys an impermissible, government-sponsored message of disapproval of and hostility toward the Christian religion . . . and our Nation's Judeo-Christian heritage."[22]

The district court found that the government had done just that; it ruled that Poway had violated the Establishment Clause by endorsing "Buddhist, Hindu, and anti-religious speech . . . while silencing the Judeo-Christian speech of Johnson." *Johnson*, 2010 WL 768856, at *19. We review that conclusion de novo, *Vasquez*, 487 F.3d at 1254, and believe the claim involves two distinct but related contentions. First, that Poway evidenced a hostility toward Judeo-Christianity in curtailing the display of the banners, and second, that it displayed a hostility toward Judeo-Christianity and an endorsement of other religious beliefs via its presentation of the "other displays."

**[14]** We start with the basics. The Establishment Clause does not wholly preclude the government from referencing religion. *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1534 (9th Cir. 1985) ("Not all mention of religion is prohibited in public schools."); *see also Stone v. Graham*, 449 U.S. 39, 42 (1980) (per curiam) ("[T]he Bible may constitutionally

---

[21]To recap, we refer to the Tibetan prayer flags; a John Lennon poster with "Imagine" lyrics; a Mahatma Gandhi poster; a poster of Gandhi's "7 Social Sins"; a Dalai Lama poster; a poster that says, "The hottest places in hell are reserved for those who in times of great moral crisis, maintain their neutrality"; and a poster of Malcolm X.

[22]We think it worthwhile to note the inherent inconsistency of Johnson's claims. If Johnson's speech does not contain some religious import, then we would be hard-pressed to see how the cessation of that speech evidences a "hostility toward the Christian religion."

be used in an appropriate study of history, civilization, ethics, comparative religion, or the like."). Not only would such a drastic and draconian requirement raise substantial difficulties as to what might be left to talk about, but, as the district court took great pains to point out, it would require that we ignore much of our own history and that of the world in general.[23] *Cf. Grove*, 753 F.2d at 1534 (noting *Stone*).

**[15]** Rather, what the Clause requires is "governmental neutrality"—"neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty., Ky. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)) (other citations omitted). It requires that the government "not be overtly hostile to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community." *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 (1989) (plurality opinion); *see Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971). In essence, the Clause serves not as a closed door, but as a judicious chaperone; it permits a certain degree of impartial and friendly dialogue, but is swift to step in once that dialogue turns *stigmatic* or *coercive*. *Tex. Monthly*, 489 U.S. at 9; *Trunk v. City of San Diego*, 629 F.3d 1099, 1109 (9th Cir. 2011); *see McCreary Cnty.*, 545 U.S. at 876 ("'The constitutional obligation of "neutrality" . . . is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation.'" (quoting *Sherbert*, 374 U.S. at 422 (Harlan, J., dissenting), with approval)).

---

[23]For instance, one could not discuss Egyptian pyramids, Greek philosophers, the Crusades, or the Mayflower if even incidental or colloquial references to objects or individuals of religious significance were constitutionally taboo.

**[16]** To determine whether the government has strayed too far from the straight course, we continue to apply the three-factor test set forth in *Lemon*. "Under *Lemon*, a government act is consistent with the Establishment Clause if it: (1) has a secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion." *Vasquez*, 487 F.3d at 1255 (citing *Lemon*, 403 U.S. at 612-13); *accord McCreary Cnty.*, 545 U.S. at 859, 875. We have noted, however, that "[i]n recent years, the Supreme Court essentially has collapsed these last two prongs to ask 'whether the challenged governmental practice has the effect of endorsing religion.' " *Trunk*, 629 F.3d at 1106 (quoting *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1043 (9th Cir. 2007) (reviewing cases)). We also note that these factors are not to be applied in a vacuum. *Pleasant Grove*, 129 S. Ct. at 1136. Context is critical when evaluating the government's conduct. *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 598 (1989) ("Under the Court's holding in *Lynch*, the effect of a crèche display turns on its setting. Here, unlike in *Lynch*, nothing in the context of the display detracts from the crèche's religious message."); *accord Trunk*, 629 F.3d at 1102; *Grove*, 753 F.2d at 1534.

**[17]** Applying *Lemon* to the undisputed facts before us, we find no violation. First, Poway did not contravene the Clause when it ordered that Johnson's banners be removed. "The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Aguillard*, 482 U.S. at 583-84 ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family."). For that reason, "[w]e have made it clear that '[g]overnmental actions taken to avoid potential Establishment Clause violations have a valid secular purpose under *Lemon*.' " *Nurre v. Whitehead*, 580 F.3d 1087, 1096 (9th Cir.

2009) (quoting *Vasquez*, 487 F.3d at 1255), *cert. denied* 130 S. Ct. 1937 (2010); *Peloza*, 37 F.3d at 522.

[18] Moreover, action taken to "avoid conflict with the Establishment Clause" and maintain the very neutrality the Clause requires neither has a primary effect of advancing or inhibiting religion nor excessively entangles government with religion. *Nurre*, 580 F.3d at 1097-98; *Vasquez*, 487 F.3d at 1257-58; *see Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225-26 (1963) (rejecting the contention that the absence of religion equates to "affirmatively opposing or showing hostility to religion"). Notably, as in *Nurre* and *Vasquez*, we do not, and need not, "adjudge the constitutionality of the" display in question in order to resolve the government's ability to curtail that bit of its own speech. *Vasquez*, 487 F.3d at 1257; *accord Nurre*, 580 F.3d at 1097-98. It is enough to note that our precedent and that of our sister circuits demonstrate that the government's ongoing display of the banners would raise at least the possibility of an Establishment Clause claim.[24] *Cf. Tucker*, 97 F.3d at 1213; *Lee*, 484 F.3d at 695; *see Berry*, 447 F.3d at 650-51. Poway was entitled to summary judgment on this aspect of Johnson's claim.

---

[24]We would not be the first to recognize the difficult position government offices often find themselves in when trying to "run the gauntlet" between not being sued under the Establishment Clause for speaking in a manner some might perceive as unconstitutionally "pro-religious" and not being sued under the very same Clause for ceasing that speech—an action that, as this case demonstrates, may be equally offensive to others. *See, e.g.*, *Nurre*, 580 F.3d at 1097; *cf. Berry*, 447 F.3d at 650. As our precedent demonstrates, government action—especially the curtailment of its own speech—taken on account of an honest interest in ensuring neutrality generally passes constitutional muster. *Nurre*, 580 F.3d at 1097-98; *Vasquez*, 487 F.3d at 1255-57. However, we also recognize that this is not always the case. *See Widmar v. Vincent*, 454 U.S. 263, 270-71 (1981) (applying *Lemon* to conclude that a university's refusal to allow religious groups access to its facilities was not justified by its fear of an Establishment Clause issue because no tenable Clause issue would exist).

In evaluating the constitutionality of the other displays, we think the court neglected its own admonishment that government speech " '[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.' " *Johnson*, 2010 WL 768856, at *6 (alteration in original) (quoting *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) (plurality opinion)). Admittedly, Gandhi, the Dalai Lama, and Malcolm X each have some religious connotation. However, as the district court noted, simple connotation does not run afoul of *Lemon*. *Van Orden*, 545 U.S. at 691-92. The same is true of the other posters. *See Pleasant Grove*, 129 S. Ct. at 1135 (describing John Lennon's song "Imagine" in its discussion of speech that may have different meanings to different people); *Grove*, 753 F.2d at 1534 (discussing The *Learning Tree*). Each would be violative only if used to endorse or inhibit religion, and nothing in the record suggests such use here.

The Tibetan prayer flags are no different. Though some amici suggest that the flags are so recognizably religious that their use "as an instrument of religion cannot be gainsaid," *Schempp*, 374 U.S. at 224 (discussing the Bible); *see Stone*, 449 U.S. at 41 (Bible and Ten Commandments), the record contains only evidence to the contrary. Lori Brickley, the science teacher who provided the flags, testified that she had no idea as to whether the flags had any particular or significant religious import, only that she had been told they represented "the basic elements" Tibetan people believe "necessary for their life." She also noted that though one of the flags contains a small picture of Buddha not one of her students had ever identified the flags as religious.

Furthermore, Brickley testified that the flags were neither hung nor used for any religious purpose. She explained that she uses the flags as part of her discussion of fossils found on and near Mount Everest because the flags are authentic—bought in Nepal near Mount Everest—and are typically purchased by climbers to put "at the top of Mount Everest when

they reach the peak." She described how she typically shows a video of scientists taking cores samples on Everest and uses the flags to further stimulate the interest of her students. She said that the flags "represent climbing a mountain" and accomplishing "an amazing goal."

Limited to these facts, we would not think that an objective observer could conclude that the flags were displayed for a religious purpose. *McCreary Cnty.*, 545 U.S. at 862 ("The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the . . . official act." (citations and internal quotation marks omitted)); *id.* at 859 (noting the rarity of finding a religious purpose). Rather, the undisputed evidence supports a common-sense conclusion that the flags are intended to stimulate scientific interest, not religious pressure (or even permissible religious discussion). *Id.* at 863; *cf. Stone*, 449 U.S. at 42.

**[19]** Of course, because the speech is the government's, Brickley's purpose is not dispositive. *Pleasant Grove*, 129 S. Ct. at 1136 ("Contrary to respondent's apparent belief, it frequently is not possible to identify a single 'message' that is conveyed by an object or structure, and consequently, the thoughts or sentiments expressed by a government entity that accepts and displays such an object may be quite different from those of either its creator or its donor."). Poway's policy prohibiting sectarian and religious displays only further supports a conclusion of secular purpose. *McCreary Cnty.*, 545 U.S. at 863 ("[T]he government's action was held unconstitutional only because openly available data supported a commonsense conclusion that a religious objective permeated the government's action.").

In regard to "endorsement"—*Lemon* factors two and three —the evidence again suggests the absence of a violation. Though the flags may very well represent the Buddhist faith, their use by Poway has nothing to do with their religious con-

notation. Instead, the evidence in this case demonstrates that the district uses the flags to stimulate interest in science and scientific discovery without any mention of religion. Thus, while the flags might themselves contain "religious content," *Van Orden*, 545 U.S. at 690, the primary effect of the school's use was entirely secular and fostered no entanglement with religion. *Cf. Lemon*, 403 U.S. at 612-13. Unlike in *Allegheny*, the "context of the display" here sufficiently "detracts" from any religious message the flags might otherwise convey. *See* 492 U.S. at 598. Any residual religious effect was therefore anodyne, not stigmatic. *Trunk*, 629 F.3d at 1109 ("By 'endorsement,' we are not concerned with all forms of government approval of religion—many of which are anodyne— but rather those acts that send the stigmatic message to nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . .' " (alteration in original) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000)) (citation and internal quotation marks omitted)).

[20] Because neither Poway's removal of Johnson's banners nor its display of other materials violated the Clause, the district court should have granted summary judgment to Poway, not Johnson. We reverse the court's judgment as to Johnson's Establishment Clause claim and remand with instructions that it enter summary judgment in favor of Poway.

## C

Finally, we reach Poway's claim that the district court erred in granting Johnson summary judgment on his claim that the district court denied him equal protection of the law when it ordered that he remove his banners but continued to permit the display of other posters and materials that Johnson believes exhibit sectarian viewpoints. We again agree with Poway that the court erred.

Our resolution of Johnson's freedom of speech and Establishment Clause claims leaves little room for discussion. All the speech of which Johnson complains belongs to the government, and the government has the right to "speak for itself." *Pleasant Grove*, 129 S. Ct. at 1131 (citation and internal quotation marks omitted). When it does, "it is entitled to say what it wishes," *Rosenberger*, 515 U.S. at 833, "and to select the views that it wants to express." *Pleasant Grove*, 129 S. Ct. at 1131 (citing *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring) ("It is the very business of government to favor and disfavor points of view . . . .")).

**[21]** Because Johnson had no individual right to speak for the government, he could not have suffered an equal protection violation. *Downs*, 228 F.3d at 1017 ("Because we determine that Downs has no First Amendment right to speak for the government, his equal protection claim based upon the deprivation of this asserted right also fails to withstand summary judgment."); *see Ceballos*, 547 U.S. at 421-22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").

**[22]** We reverse and remand to the district court with instructions to enter judgment in favor of Poway on this issue.

## IV

In conclusion, we agree with the district court that no genuine issue of material fact remains in the present case. However, the district court made a critical error when it determined that Poway had created a limited public forum for teacher speech and evaluated Poway's actions under a traditional forum-based analysis rather than the controlling *Pickering*-based inquiry. Applying the correct legal principles

to the undisputed facts before us, we conclude that Poway was entitled to judgment as a matter of law on each of the claims raised by Johnson.

We thus reverse and remand with instructions that the district court vacate its grant of injunctive and declaratory relief, as well as its award of damages, and enter summary judgment in favor of Poway and its officials on all claims. Johnson shall bear all costs. Fed. R. App. P. 39(a)(3).

**REVERSED and REMANDED with instructions.**

**APPENDIX**



