Filed 4/3/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STEPHEN SEDLOCK et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TIMOTHY BAIRD et al., <br><br> Defendants and Respondents; <br><br> YES! YOGA FOR ENCINITAS STUDENTS, <br><br> Intervener and Respondent. | D064888 <br><br><br><br> (Super. Ct. No. 37-2013-00035910-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge. Affirmed.

National Center for Law and Policy and Dean Robert Broyles for Plaintiffs and Appellants.

Kevin T. Snider for Pacific Justice Institute; Alan Jay Reinach for Church State Council; James Leslie Hirsen and Deborah Jane Dewart for World Faith Foundation as Amici Curiae on behalf of Plaintiffs and Appellants.

Stutz Artiano Shinoff and Holtz, Daniel R. Shinoff, Paul V. Carelli IV, and Jack M. Sleeth, Jr., for Defendants and Respondents.

Atkison, Andelson, Loya, Ruud & Romo, Stephanie Marie White for California School Boards Association's Education Legal Alliance; Pillsbury Winthrop Shaw Pittman, Kevin Murray Fong and Nathaniel Robert Smith for Yoga Alliance as Amici Curiae for Defendants and Respondents.

Coast Law Group, David A. Peck; Snell & Wilmer and Mary-Christine Sungaila for Intervener and Respondent.

James & Stewart, Irene E. Stewart; and Martin S. Kaufman for Atlantic Legal Foundation as Amicus Curiae for Intervener and Respondent.

## I.

## INTRODUCTION

For many in this country, the practice of yoga is an entirely secular experience undertaken for reasons such as increasing physical flexibility, decreasing pain, and reducing stress. For others, the practice of yoga is a religious ritual, undertaken for spiritual purposes. In this case, we are required to determine whether a school district's institution of a yoga program as a component of its physical education curriculum constitutes an impermissible establishment of religion in violation of the California Constitution.

After a careful review of the extensive evidence presented in the trial court concerning the nature of the particular yoga program at issue in this case, we conclude that the program is secular in purpose, does not have the primary effect of advancing or inhibiting religion, and does not excessively entangle the school district in religion. Accordingly, we conclude that the trial court properly determined that the district's yoga program does not violate our state constitution.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Procedural background*

In February 2013, appellants Stephen and Jennifer Sedlock, and their children, J.S. and F.S., by and through their guardian William Frederick Bentz (collectively Sedlocks), filed this action against the Encinitas Union School District, its superintendent, Timothy Baird, and the District's five governing board members (collectively the District).[1] In a verified petition for writ of mandate and complaint for injunctive and declaratory relief, the Sedlocks alleged that the District's implementation of an Ashtanga yoga program as a component of its physical education curriculum violated various religious freedom

---

[1]      The Sedlocks' initial petition/complaint did not expressly name the Encinitas Union School District as a defendant.  However, in April 2013, the Sedlocks filed an amendment to their petition/complaint adding the Encinitas Union School District as a named defendant.

provisions of the California Constitution.[2]  The Sedlocks sought a writ of mandate and brought claims for injunctive and declaratory relief in which they requested that the court enjoin the District from continuing to implement its yoga program and declare the program unconstitutional.

An entity called Yes! Yoga for Encinitas Students[3] filed a motion to intervene in support of the District and its yoga program.  The trial court granted the motion to intervene.[4]  The Sedlocks and respondents subsequently filed trial briefs, together with accompanying declarations and exhibits, and the trial court held a bench trial on the matter.  After the trial, the court entered a statement of decision in which it concluded that the District's yoga program is constitutional.  The court entered a judgment in favor of respondents.  The Sedlocks timely appeal the judgment.

---

[2]     Among these provisions is article I, section 4, which prohibits government practices "respecting an establishment of religion."  (Cal. Const., art. I, § 4.)
Although the Sedlocks brought several other claims in their petition/complaint, their sole claim on appeal pertains to the causes of action referenced in the text.

[3]     According to their verified complaint in intervention, Yes! Yoga for Encinitas Students is an "unincorporated association comprised of over 100 elementary students currently enrolled in the [District] and their parents."

[4]     We refer to the District and Yes! Yoga for Encinitas Students collectively as "respondents."

B.    *Factual background* [5]

1.    *The District*

The District is a public school district consisting of nine elementary schools.  It

serves approximately 5,600 students in grades Kindergarten through Sixth, who live in

Encinitas and the La Costa area of Carlsbad.

2.    *Ashtanga yoga*

Ashtanga yoga is a form of yoga developed and popularized by K. Pattabhi Jois.

According to Jois, the meaning of yoga is explained in a series of Hindu texts, including

the Bhagavad Gita, the Upanishads, and Yoga Sutras.  Jois first established an institute for

the teaching of Ashtanga yoga in India in the 1940s, and introduced Ashtanga yoga in the

United States after traveling to Encinitas in 1974.

As developed and popularized by Jois, Ashtanga yoga prescribes eight limbs.  The

limbs are referred to as yamas (moral codes), niyamas (self-purification), asanas

---

[5]    We base of our statement of facts in part on the detailed factual findings contained in the trial court's statement of decision.  (See, e.g., *Biron v. City of Redding* (2014) 225 Cal.App.4th 1264, 1268-1269 ["The trial court filed a lengthy and detailed statement of decision.  Plaintiffs make no claim that the evidence was insufficient to support the trial court's findings of fact.  Therefore we derive most of the factual background in this opinion from the trial court's findings of fact contained within the statement of decision"].)  As discussed in part III.A., *post*, while the Sedlocks make numerous factual assertions in their brief, they do so without raising any distinct substantial evidence challenge to the trial court's factual findings.  In addition, the statement of facts contained in the Sedlocks' opening brief does not state the facts in the light most favorable to the judgment, as is required.  (See, e.g., *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739 ["In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment' "].)

(postures), pranayana (breath control), pratyahara (withdrawing the mind from the senses), dharana (concentration), and samadhi (union with the divine).

Ashtanga yoga prescribes approximately 100 yoga poses, including two series of opening poses, two series of poses characterized as either primary or intermediate, and a series of finishing poses.[6]

3. *The KP Jois Foundation*

During the 2011-2012 school year, the KP Jois Foundation (the Foundation) funded a yoga program at one of the District's schools, Capri Elementary. According to the trial court, the Foundation[7] is a foundation with a "mission to establish and teach Ashtanga yoga in the community, at minimum, the physical postures, breathing, and relaxation." In addition, the Foundation has an interest in promoting yoga in schools as an alternative to traditional physical education. However, as the trial court noted, the record contains "little direct evidence as to . . . the structure of the [Foundation]," and there is "no evidence that it is a religious foundation, *per se*."

---

[6] A poster depicting the poses is contained in the record.

[7] The District and the Sedlocks state in their briefs that that the Foundation has been renamed "Sonima Foundation."

4.    *The 2011 yoga program at Capri Elementary*

The principal of Capri Elementary hired Jennifer Brown, who also taught at a Jois yoga studio in Encinitas,[8] to teach the yoga classes.  Brown is certified to teach Ashtanga yoga by the Pattabhi Jois Institute in Mysore, India.  The yoga classes that Brown taught at Capri Elementary were based in part on the primary series of poses in Ashtanga Yoga. Brown also taught her students some Sanskrit words related to yoga.  In addition, Brown read selections from a book called "Myths of the Asanas," which contains numerous references to Hindu deities.  Brown omitted references to these deities.  In addition, she taught the children to say "namaste," which she interpreted to mean "respect."

District officials were pleased with the yoga program at Capri Elementary. Assistant superintendent David Miyashiro decided to attempt to secure additional funding from the Foundation in order to expand the yoga program to all of the District's schools.

5.    *The 2012 grant proposal and memorandum of understanding*

In July 2012, the District presented the Foundation with a grant proposal.  The grant proposal contained an overview that stated in part:

> "The following puts into place a partnership between the . . . Foundation and
> the . . . District . . . to deliver a world class mind/body wellness program at all nine
> Encinitas elementary schools.  The core foundation of this program will be built around
> providing students, staff, and families access to Ashtanga Yoga on a regular basis
> throughout the year."

The grant proposal further specified that "comprehensive yoga instruction" would be provided to all students, and that classes would be taught by "certified yoga

---

[8]    Brown testified that the Foundation and the Jois yoga studio are "totally separate" entities.

instructors, selected and hired by District staff and trained by . . . Foundation teachers." The grant proposal also provided that the District would develop a yoga curriculum that would be "scalable and transferable to other settings."  One aspect of the curriculum was to be instruction concerning "life skills built around key themes of yoga instruction such as self-discipline, balance, and responsibility."

The Foundation awarded the grant, and the Foundation and the District entered into a memorandum of understanding.  The memorandum of understanding specified that the Foundation would award the District "$533,720 for the implementation of a district-wide yoga program."  The memorandum of understanding further stated, "as agreed upon by both parties and detailed within the approved grant . . . proposal, [the District] will provide the oversight for the implementation of a comprehensive yoga instruction for [Kindergarten through Sixth] grade students and the development of curriculum supporting yoga instruction with a focus on life skills."

The District also entered into an agreement with Regur Development Group, Inc. (Regur), to act as a personnel manager with respect to the grant, including formally hiring the yoga teachers and overseeing the human resources aspects of their employment.

6.      *The development of the yoga program*

After the grant was awarded in the summer of 2012, the District and the Foundation each compiled a list of potential candidates to teach the classes.  From these lists, 22 individuals were invited to attend several training sessions during the summer. Miyashiro, a representative from the Foundation, and a representative from Regur

oversaw the training sessions. During the sessions, the Foundation's representative assisted in evaluating whether the prospective candidates could teach yoga poses to children. From this pool of candidates, the District, through its principals, selected 10 individuals to teach yoga classes in the District's yoga program.

The District selected a woman named Leslie Wright to serve as the lead writer of the yoga curriculum. Throughout the 2012-2013 school year, the District held weekly staff development meetings during which the yoga teachers, Miyashiro, Wright, and a representative from Regur developed the curriculum. Miyashiro identified the standards to be used for the development of the curriculum based on physical education standards established by the State of California and Social Emotional Learning standards adopted by the State of Illinois. The Foundation did not participate in the development of the curriculum.

In November 2012, the District completed an initial draft of its yoga curriculum. The draft curriculum consisted of a series of grade specific lesson plans for the teaching of various yoga poses, breathing exercises, and character traits. The curriculum also contained guided meditation scripts to be used during the lessons.[9]

---

[9]     On such script stated as follows:

> "When we're practicing yoga, we always breathe in through the nose and out through the nose. We want the breath to make a soft sound like the sounds of the ocean waves as the[y] come and go from the shore. It's kind of like whispering 'haaa' with your mouth closed. Let's try this. Take a deep inhale and as you exhale, whisper 'haaa.' Inhale again, this time with the mouth closed, 'haaa.' Let's see if we can get the same sound on the inhale. Try imagining inhaling the scent of a sweet flower."

7.      *The implementation of the District's yoga program*

At the beginning of the 2012-2013 school year, five schools participated in the yoga program. The yoga program was expanded to all nine schools in January 2013. As described in detail in part III.C.3.b., *post,* the classes involved instruction in performing various yoga poses, proper breathing, and relaxation. The classes also contained instruction designed to instill various character traits, such as empathy and respect.

As the District began implementing the program, some parents complained that the program was religious. The trial court described the manner by which the District responded to these complaints as follows:

> "When the program was rolled out to the parents over the Summer of 2012, there were complaints from parents that the program was religious. The District responded by remov[ing] anything considered [a] cultural component[] or that could be arguably deemed religious. Jennifer Brown's Ashtanga tree poster was removed almost immediately (and that was her personal poster).[10] All Sanskrit language was removed. Jenn Brown took down . . . postcards from India. The names of the poses were changed to kid-friendly, kid-familiar poses. The so called 'lotus' position, was renamed 'criss-cross applesauce.' There was something called a *mudra*, which is where you put your thumb and your forefinger together. That was eliminated, and instead what was substituted was something called "brain highway" where students tap alternate fingers with their thumbs. And there was no namaste or chanting 'om.' "

The District continued to revise its yoga curriculum, and released a second version in the spring of 2013. As with the initial curriculum, the revised curriculum, discussed in detail in part III.C.3.b., *post*, consists of a series of grade-specific lesson plans for the

_____

10      At trial, Brown testified that for a few days at the beginning of the 2012-2013 school year, she displayed a decorative tree made out of tissue paper and palm tree leaves. Brown stated that "each palm tree leaf was a branch of Ashtanga yoga," and that the limbs were labeled with the Sanskrit words for each branch. Brown testified that she never explained to the children the meaning of the words, and that she, herself, did not know the meaning of the word samadhi, the eighth limb, which means union with god.

teaching of various yoga poses, proper breathing, relaxation, and character traits. Unlike the fall 2012 curriculum, the spring 2013 curriculum did not include guided meditation scripts. In addition, the revised curriculum omitted certain references from the initial draft curriculum that the Sedlocks contend were "overtly religious." For example, the Sedlocks note that the statement, "[y]oga brings [out] the inner spirit of the child," which appeared in the 2012 curriculum was removed from the 2013 curriculum.

III.

DISCUSSION[11]

*The District's yoga program does not constitute an establishment of religion*
*in violation of article I, section 4 of the California Constitution*

The Sedlocks contend that the trial court erred in concluding that the District's yoga program does not constitute an establishment of religion in violation of article I, section 4 of the California Constitution.[12]

A.  *Standard of review*

---

[11]  We have read and considered a number of amicus curiae briefs in deciding this appeal. An entity called Yoga Alliance filed an amicus brief in support of respondents. The California School Boards Association's Education Legal Alliance filed an amicus brief in support of the District. The Atlantic Legal Foundation filed an amicus brief in support of Yes! Yoga for Encinitas Students. The World Faith Foundation filed an amicus brief in support of the Sedlocks. The Pacific Justice Institute and the Church State Council filed a joint amicus brief in support of the Sedlocks. Yes! Yoga for Encinitas Students filed a consolidated answer to the amicus briefs filed in support of the Sedlocks.

[12]  The Sedlocks do not raise any independent claim under the federal constitution.

11

The parties disagree as to the proper standard of review. The Sedlocks contend that this court should apply the de novo standard of review to their claim.[13] Respondents maintain that we should defer to the trial court's factual findings to the extent that those findings are supported by substantial evidence, and apply the independent standard of review in selecting the applicable law and applying that law to the facts of the case. We agree with respondents.

In *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801, the Supreme Court outlined the appropriate standard of review to be applied in cases in which an appellant's claim raises a mixed question of fact and law.

> " . . . 'There are three steps involved in deciding a mixed fact/law question. The first step is the establishment of basic, primary or historical facts. The second is the selection of the applicable law. The third is the application of law to the facts. All three trial court determinations are subject to appellate review. Questions of fact are reviewed by giving deference to the trial court's decision. Questions of law are reviewed under a nondeferential standard, affording plenary review. [Citation.] However, as to the third step, the application of law to fact . . . ' [i]f " ' . . . the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.' " ' [Citation.]"

The Sedlocks' claim raises a question of mixed fact and law. Specifically, the Sedlocks make assertions on appeal that pertain to the historical facts of this case, including how the yoga teachers in this case were trained and certified, how the District developed the yoga curriculum, and the nature of the relationship between the Foundation

---

13    The Sedlocks contend that the de novo standard of review is appropriate where "the historical facts are admitted or established." However, as discussed in the text, certain historical facts relevant to the Sedlocks' claim are contested. We defer to the trial court's factual findings concerning such historical facts wherever they are supported by substantial evidence.

and the District. We apply the substantial evidence standard of review to the trial court's factual findings with respect to such issues. We apply the de novo standard of review in selecting the applicable law and in applying such law in determining whether the District's yoga program violates the establishment clause of the state Constitution.

B.    *Governing law*

1.    *The establishment clause of the state Constitution*

Article I, section 4 of the California Constitution provides in relevant part:

> "The Legislature shall make no law respecting an establishment of religion."

In *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693 (*East Bay*), the California Supreme Court explained that "the protection against the establishment of religion embedded in the California Constitution" does not "create[] broader protections than those of the First Amendment [of the United States Constitution]." (*East Bay, supra* at p. 718.) The *East Bay* court further stated that, "the California concept of a 'law respecting an establishment of religion' ([Cal. Const.,] art. I, § 4) coincides with the intent and purpose of the First Amendment establishment clause." (*East Bay, supra,* at p. 718.) The *East Bay* Court reasoned:

> "We reach this conclusion because the establishment clause was not added to article I, section 4 until 1974.
>
> "When article I, section 4 was readopted with minor editorial changes by the electorate as part of the constitutional revisions made in 1974, the present establishment clause was included. The Legislative Analyst and the Chairman of the Constitution Revision Commission each explained that the intent was to add to the California Constitution a right that was then contained in the federal Constitution. [Citations.] Presumably, the electorate intended that the right being added to article I, section 4 through the new establishment clause would afford the same protection as the establishment clause of the First Amendment on which it was patterned. There is nothing in the history of the clause to suggest that the drafters or the electorate intended that the clause be any more protective

13

of the doctrine of separation of church and state than the First Amendment establishment clause."  (*East Bay*, *supra*, at pp. 718-719.)

Thus, in determining whether a government practice violates the establishment clause of the state Constitution, California courts are guided by First Amendment establishment clause jurisprudence.  (See, e.g., *East Bay*, *supra*, 24 Ca.4th at p. 719 ["Our construction of the establishment clause of article I, section 4 is . . . guided by decisions of the Supreme Court"]; *Sands v. Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 883 (*Sands*) (lead opn. of Kennard, J.) ["federal cases . . . supply guidance for interpreting [the establishment clause of state Constitution]"].)

2.     *The* Lemon *test*

In *Lemon v. Kurtzman* (1971) 403 U.S. 602 (*Lemon*), the United States Supreme Court adopted a three-part test to determine whether a government practice violates the establishment clause of the First Amendment.  In order for a government program to be constitutional: (1) the government program must have "a secular legislative purpose"; (2) the program's "principal or primary effect must be one that neither advances nor inhibits religion"; *and* (3) the program "must not foster 'an excessive government entanglement with religion.' "  (*Lemon, supra,* at pp. 612–613.)

While the United States Supreme Court "has acknowledged that it does not apply the *Lemon* test in every establishment clause case" (*California Statewide Communities Development Authority v. All Persons Interested etc.* (2007) 40 Cal.4th 788, 808), and the test is "much maligned by scholars and various Justices, *Lemon* has never been overruled."  (*Alvarado v. City of San Jose* (9th Cir. 1996) 94 F.3d 1223, 1231 (*Alvarado*).)

14

Accordingly, we apply the *Lemon* test as a structure for our analysis, and, where applicable, address other pertinent authority. (See, e.g., *Paulson v. Abdelnour* (2006) 145 Cal.App.4th 400, 422 ["we will use the *Lemon* test as a structure for our analysis and where applicable, employ the teaching of [other United States Supreme Court] and California authority"].)[14]

C.  *The District's yoga program passes the* Lemon *test*

1.  *The religion at issue*

It is undisputed that Hinduism is a religion. We assume, without deciding, that Ashtanga yoga, insofar as it prescribes the practice of an eight-limbed form of yoga in which the eighth and final limb is "union with the universal or the divine," is a religion for purposes of the establishment clause of the California Constitution. (Cf. *Brown v. Woodland Joint Unified School Dist.* (9th Cir. 1994) 27 F.3d 1373, 1378 (*Brown*) [assuming, without deciding, that Wicca is a religion and applying the *Lemon* test in order to determine whether school district's curriculum violated establishment clauses of the California and federal Constitutions].) Accordingly, we apply the *Lemon* test to determine whether the District's yoga program advances Hinduism or Ashtanga Yoga.[15]

---

14    All parties to this appeal apply the *Lemon* test in their briefing, and cite additional establishment clause case law, as well.

15    Respondents argue that we need not apply the *Lemon* test because the District's yoga program does not manifest any of the indicia of a religion. In our view, the proper inquiry under *Lemon* is not whether the government program is *itself* a religion, but whether the program has a secular purpose, whether the program has a primary effect that

15

2. *The District's yoga program has a secular purpose*

The Sedlocks do not contest that the District's yoga program has a secular purpose.

Further, the record contains overwhelming evidence demonstrating that the District

instituted the yoga program for a secular purpose, namely, to implement a physical fitness

program that promotes physical and mental health. Accordingly, we conclude that the

District's yoga program easily satisfies the secular purpose prong of the *Lemon* test.

3. *The primary effect of the District's yoga program is one that neither advances nor inhibits religion*[16]

a. *Additional relevant law*

"Under the 'primary effect' test of *Lemon, supra,* 403 U.S. 602, the inquiry is

whether, irrespective of the government's actual objective, the practice in question

conveys a message of endorsement or disapproval." (*Sands, supra,* 53 Cal.3d at pp. 872 -

873 (lead opn. of Kennard, J.).) "By 'endorsement,' we are not concerned with all forms

of government approval of religion—many of which are anodyne—but rather those acts

that send the stigmatic message to nonadherents ' "that they are outsiders, not full

members of the political community, and an accompanying message to adherents that

advances religion, and whether the program entangles government with a religion. (See *Lemon, supra*, 403 U.S. at pp. 612-613.) However, whether a governmental program has religious attributes is clearly highly relevant in applying the *Lemon* test.

[16] The Sedlocks argue, "[A] reasonable observing student in [the District], who is familiar with [the District's] yoga program would conclude that the yoga program both advances/endorses Hinduism and inhibits/disapproves of other religions, including Christianity." In so arguing, the Sedlocks focus on the manner by which the District's yoga program purportedly advances Hinduism and contend that by advancing Hinduism, the District necessarily inhibits all other religions (including Christianity).

16

they are insiders, favored members . . . ." ' " (*Trunk v. City of San Diego* (9th Cir. 2011) 629 F.3d 1099, 1109.)  In ascertaining whether the government practice endorses religion, "we conduct our inquiry from the perspective of an 'informed and reasonable' observer who is 'familiar with the history of the government practice at issue.' "  (*Id*. at p. 1110.)

In the elementary school context, "Courts . . . have considered the more vulnerable nature of school-age children when analyzing the primary effect of state actions . . . ." (*Brown, supra,* 27 F.3d at pp. 1378-1379.)  However, courts do not consider the effect that the challenged government practice has had "on a particular public school student," but rather, employ an "objective standard."  (*Id*. at p. 1379.)  A subjective standard is not used because, "[i]f an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself."  (*Ibid*.)

Finally, in determining whether the challenged practice has a primary effect that advances or inhibits religion, we evaluate the challenged government practice " 'as a whole' " (*Nurre v. Whitehead* (9th Cir. 2009) 580 F.3d 1087, 1097 (*Nurre*)), rather than segmenting portions of the practice and "view[ing] them in isolation." (*Ibid*.)

b.   *The primary effect of the District's yoga program does not advance Hinduism or Ashtanga Yoga*

In assessing whether a reasonable observer would view the District's yoga program as advancing or inhibiting religion, we begin by reviewing the trial court's factual findings concerning the District's yoga program as it existed in 2013. The trial court noted that the 2013 written curriculum contains half-hour lesson plans that prescribe "yoga poses performed in a definite sequence," labeled with kid-friendly names. The court noted that the curriculum also "involve[s] controlled breathing and some introspection and thinking." The court analogized the poses "to isometric . . . stretching exercises." For example, the court explained that one pose in the curriculum is called "boat." To perform the boat, the child "[lies] on his or her back, [and] extend[s] his legs, arms up." The court noted that while the curriculum prescribes an opening and closing sequence of poses that are identical to a series of poses performed in Ashtanga yoga, the curriculum does not contain all of the 100-or-so yoga poses performed in Ashtanga Yoga.[17]

---

[17]   The trial court noted that "[t]he opening and closing sequences of [the District's] poses are identical to the Ashtanga yoga poses in Opening Sequences A and B . . . and the Closing lotus sequence . . . depicted on Exhibit 9, which is the Shri Pattahbi Yogi Ashtanga Yoga Institute poster." Exhibit 9 is a poster that states that the top, "Shri K. Pattabhi Jois Ashtanga Yoga Institute," and depicts approximately 100 yoga poses, labeled in Sanskrit.

The court summarized a typical lesson plan as follows:

"There is a physical component . . . and there is a character component. And there is a famous person and quote that is to be focused on. The quotes are not religious. As examples, one of the famous persons is Babe Ruth and his quote was, 'Every strike brings me closer to my next home run,' and that's for the subject of 'Perseverance.' Another quote is: 'The time is always right to do what is right,' by Martin Luther King., Jr. For the subject of "Collaboration," Phil Jackson is quoted as saying, 'The strength of the team is each individual member. The strength of each member is the team.' The Reverend Jessie Jackson is quoted on the subject of 'Empathy': 'Never look down on anybody unless you're helping them up.'

"Then the curriculum indicates a breathing exercise. The teacher can choose a couple. Dragon breath, belly breathing, floating arms, connect breath with movement, kite, cat, cow. And then the posture is 20 minutes. The opening is Opening Sequence A, the kangaroo and the warrior. And then the standing pose is big toe, volcano, elephant, and mouse pose, seated fold, butterfly, half butterfly, back-bending, boat, mouse pose, optional is the windmill, and there's a candle pose. And then five minutes of relaxation. The curriculum suggests to the teacher, 'Before the closing sequence, take a moment to check in with your students.' That's the direction to the teacher. 'How are you feeling? How are you breathing? How did you show respect in class today?' And then the closing sequence: Telephone, pretzel, butterfly, flower, turtle, criss-cross applesauce, and rest."

The trial court also reviewed the declarations of the yoga teachers and a school principal who had attended yoga classes at her school, and noted there had been a "uniform denial of anything spiritual, religious, or anything like that being taught in the classes." In addition, the court viewed videos of excerpts of the yoga classes and read declarations of parents who were opposed to the yoga program.[18] After reviewing this

---

[18] The Sedlocks note that the videos show some children with their hands making a wisdom gesture (in which the thumb and forefinger are touching, forming a circle). Citing the testimony of their religious studies expert, Dr. Candy Brown, the Sedlocks contend, "Forming a circle with each thumb and index finger symbolizes subordination of the individual spirit (*Atman,* represented by the index finger) by the Universal Spirit (*Brahman,* represented by the thumb) and brings about unification of the individual with Universal Consciousness." While the videos show some children making this gesture during some of the classes, the trial court found that the District had eliminated teaching this gesture, and there was no evidence presented that the District had taught the gesture

evidence, the trial court determined that, contrary to the Sedlocks' assertions, the District's yoga program is not Ashtanga yoga, and that it is "devoid of any religious, mystical, or spiritual trappings."

We have carefully reviewed the evidence upon which the trial court made this determination, and agree that a reasonable observer would view the content of the District's yoga program as being entirely secular. As the trial court described in its statement of decision, the District's yoga classes consist of instruction in performing yoga poses, breathing, and relaxation, combined with lessons on building positive personal character traits, such as respect and empathy. We see nothing in the content of the District's yoga program that would cause a reasonable observer to conclude that the program had the primary effect of either advancing or inhibiting religion.

We acknowledge that a reasonable observer would be aware that the grant funding the District's yoga program specified that the "core foundation" of the program would be providing access to "*Ashtanga* yoga." (Italics added.) However, a reasonable observer would also be aware that, as *implemented*, the District's yoga program is clearly *not* Ashtanga eight-limbed yoga. To be sure, if the District's program instructed children that through yoga they would become one with God and that yoga could help end the karmic

_____

for a religious purpose or that it had even conveyed the purported religious significance of the gesture.

Similarly, the Sedlocks contend that the religious nature of the District's yoga program is demonstrated by the fact that some children chanted "Om" during some of the classes. Even assuming that a child's chanting of "Om" reflects a genuine religious expression rather than mere mimicry of a stereotypical yogi, the District does not teach chanting as a component of its yoga program.

20

cycle of reincarnation—both of which are aspects of Ashtanga yoga practice according to the Sedlocks' expert, Dr. Brown—we have little doubt that the program would violate the establishment clause. However, nowhere in the District's curriculum is there mention of *any* of the eight limbs of Ashtanga, and there is certainly no mention of the final limb (union with the divine).[19] Indeed, as described above, there is no evidence of *any* religious indoctrination in any of the written curriculum or in the evidence related to the teaching methods employed in actual District yoga classes.

The Sedlocks' arguments in support of their claim that a reasonable observer would view the District's yoga program as having a primary effect that advances or inhibits religion are unpersuasive and/or not supported by the trial court's factual findings.[20] To begin with, the Sedlocks claim that a reasonable observer would conclude that the District's yoga program advances religion because the Foundation has a

---

[19] The Sedlocks claim that the District's curriculum "still includes at least seven of the eight Ashtanga limbs," but in so stating, the Sedlocks mean only that the District teaches practices that can be said to in some way coincide with Ashtanga yoga's "eight limbs." For example, the Sedlocks maintain that because the District's yoga curriculum contains "character connections" built around quotations from famous people, the curriculum contains instruction on "yamas" (moral restraints) and "niyamas" (ethical observances). We think it clear that a reasonable observer would not view lessons built around the quotations mentioned in the text from famous persons such as the Reverend Jessie Jackson and Babe Ruth as instilling Ashtanga/Hindu teachings.

[20] We have addressed all of the arguments that the Sedlocks raise in the legal argument portion of their opening brief arguing that the District's yoga program has the primary effect of advancing or inhibiting religion. In addition, we have attempted to address all of the contentions that the Sedlocks raise in other portions of their brief (including in their statement of facts) that could be understood as relevant to their primary effect argument.

"mission" to disseminate the religious teachings of Pattahbi Jois and the practice of Ashtanga yoga throughout the United States. This argument is unpersuasive given that there is little evidence concerning the Foundation's goals in providing the grant to the District and there is *no* evidence that any assumed religious goals of the Foundation have, in any manner, affected the implementation of the District's yoga program.[21]

In a related vein, the Sedlocks argue that a reasonable observer would be aware that the Distict's "yoga instructors must be certified and trained by the [Foundation], and the [District's] curriculum is developed by [the] Foundation." The trial court found that the Foundation's involvement in certifying and training the teachers is strictly limited to ensuring that the teachers are proficient in teaching yoga poses to the students. The court also found that the Foundation "was not part of the curriculum development." All of these findings are supported by substantial evidence. In addition, there is no evidence that the Foundation demanded that religious principles be taught in yoga classes or insisted that the teachers selected to teach the classes be versed in religious ideology. Thus, a reasonable observer would not view the Foundation's involvement in funding the District's yoga program as demonstrating that the program has the primary effect of advancing or inhibiting religion.

---

[21] Dr. Baird testified that he did not know "what [the Foundation's] purpose is," but stated that Foundation representatives told him that "one of their goals was to improve health and wellness in students," and that "they were concerned about student obesity [and] diabetes." The Sedlocks' counsel also asked Dr. Baird if he was aware that Foundation representatives had "publicly stated that their goal is to . . . spread the teaching of Shri K. Pattabhi Jois." Dr. Baird responded, "I'm not aware of that. That's never been expressed to me, that they were doing that."

We are similarly not persuaded by the Sedlocks' contention that the fact that students in the District's yoga program perform poses that *some* individuals perform for religious purposes demonstrates that the District's yoga program is religious.[22] This argument is contrary to well-established First Amendment jurisprudence. "[A] practice's mere consistency with or coincidental resemblance to a religious practice does not have the primary effect of advancing religion." (*Brown, supra*, 27 F.3d at p. 1380.)

In *Johnson v. Poway Unified School Dist.* (9th Cir. 2011) 658 F.3d 954, 974 (*Johnson*), for example, the Ninth Circuit rejected a First Amendment establishment clause challenge based on a teacher's display of Tibetan prayer flags. The teacher testified that the flags were used as part of a discussion of fossils found on and near Mount Everest.[23] The *Johnson* court concluded that the teacher's display of the flags did not violate the establishment clause of the First Amendment because they were not used to advance a religious purpose, notwithstanding that the flags might have religious significance in some contexts. In reaching this conclusion, the court reasoned:

---

[22] For example, the Sedlocks argue "when [the District's] students are being led through Ashtanga's *Surya Namskara* A & B (Sun Salutations) [as part of the District's Opening Sequence A and B], they are engaging in ritualized liturgical obeisance to *Surya*, the Hindu solar deity."

[23] The *Johnson* court summarized the teacher's use of the flags as follows:

> "She explained that she uses the flags as part of her discussion of fossils found on and near Mount Everest because the flags are authentic—bought in Nepal near Mount Everest—and are typically purchased by climbers to put 'at the top of Mount Everest when they reach the peak.' She described how she typically shows a video of scientists taking cores samples on Everest and uses the flags to further stimulate the interest of her students. She said that the flags 'represent climbing a mountain' and accomplishing 'an amazing goal.' " (*Johnson, supra*, 658 F.3d at pp. 973-974.)

"Though the flags may very well represent the Buddhist faith, their use by Poway has nothing to do with their religious connotation. Instead, the evidence in this case demonstrates that the district uses the flags to stimulate interest in science and scientific discovery without any mention of religion. Thus, while the flags might themselves contain 'religious content' [citation], the primary effect of the school's use was entirely secular . . . ." (*Johnson, supra*, 658 F.3d at p. 974.)

The same is true in this case. While for some, certain yoga poses have a religious significance, the evidence in this case demonstrates that the District directed its students to perform these poses for purely secular reasons, and did not instruct the students regarding the religious significance of the poses. A reasonable observer would not conclude that the District is engaged in religious activity merely because teachers directed the children to perform poses that some individuals consider to have religious significance.

The Sedlocks' contention that the District's program is unconstitutional because "[r]eligious intentions may develop *through* performance of religious rituals," such as the yoga poses at issue in this case, is equally unpersuasive. In support of this contention, the Sedlocks include quotations from Pattabhi Jois and his son, espousing similar claims, and note that Dr. Brown contended that there is "[s]ociological research" that substantiates this effect. Even assuming that the Sedlocks are correct that the District's yoga program renders its students more susceptible to Hindu religious teachings at some unspecified time in the future, the establishment clause is concerned with whether a government has a " 'direct and immediate effect' " of advancing religion. (*Brown, supra*, 27 F.3d at p. 1382.) Accordingly, in *Brown*, the Ninth Circuit rejected a nearly identical argument:

"[T]he Browns characterize their proffered expert testimony as demonstrating that the Challenged Selections, through the use of neuro-linguistic programming, gradually and

24

> subconsciously will 'foster and promote' a magical world view that renders children susceptible to future control by occult groups and more likely to become involved in occult practices later in their lives. Such testimony is irrelevant to the primary effect test, which determines whether a government action will have the primary or 'direct and immediate' effect of advancing religion. The claimed long-term propensity for involvement in the occult through neuro-linguistic programming clearly is not such a primary or 'direct and immediate' effect." (*Ibid.*)

We therefore reject the Sedlocks' contention that the District's yoga program violates the establishment clause because the practice of yoga poses, alone, "even without discussion of Hindu religious beliefs or the other seven limbs of Ashtanga," has the primary effect of advancing Hinduism and/or Ashtanga yoga. (Cf. *McCreary County, Ky. v. ACLU* (2005) 545 U.S. 844, 863 ["If someone in the government hides religious motive so well that the ' "objective observer, acquainted with the text, legislative history, and implementation of the statute" ' [citation], cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides"].)

The Sedlocks' contention that "even if one assumes . . . that Ashtanga is not being taught, the student [as a reasonable observer] would still understand that *yoga is religious*" (italics added), is also less than convincing. If, by this argument, the Sedlocks mean merely that yoga has religious roots, such a historical connection clearly would not lead a reasonable observer to conclude that the District's yoga program is religious.[24]

_____

24    The Sedlocks note that in the trial court's statement of decision, the court made the statement, "yoga is religious." Based on this statement, the Sedlocks argue that the trial court "found" that yoga is religious, and suggest that this determination is inconsistent with the court's conclusion that the District's yoga program is not religious.

We interpret the trial court's statement that "yoga is religious" in the following quotation from its statement of decision as meaning merely that yoga has religious roots and that, for some individuals, yoga is practiced for religious reasons:

25

(See, e.g., *McGowan v.Maryland* (1961) 366 U.S. 420, 431(*McGowan*) [rejecting establishment clause challenge to Sunday closing laws even though there was "no dispute that the original laws which dealt with Sunday labor were motivated by religious forces"]; *Granzeier v. Middleton* (6th Cir. 1999) 173 F.3d 568, 575 (lead opn. of Boggs, J.) [noting that the names of the days of the week have their origins in the names of various deities but that "no one has seriously, and certainly not successfully, contended that the Establishment Clause is offended by the use of those names"].) "Cultural history establishes not a few practices and prohibitions religious in origin which are retained as secular institutions and ways long after their religious sanctions and justifications are gone." (*McGowan, supra*, at p. 503 (conc. opn. of Frankfurter, J.).) Thus, while Dr. Brown stated that she considers chiropractic, acupuncture, karate, and Taekwondo all to be "religious practice[s]," a reasonable observer would not conclude that an activity has the primary effect of advancing religion merely because of its historical association with religion.[25]

---

"The scholars agree that the roots of yoga are religious, as practiced in the traditions of some Eastern religions such as Hinduism and Buddhism. To some in the world, yoga has been, and still is, a physical, mental, and spiritual practice, the object of which is to attain self-purification and ultimately union with the universal spirit or the divine.

"Accordingly, the Court determines that yoga is religious. That brings the Court to the key issue in this case. Since yoga and Ashtanga yoga have religious roots in Hindu, Buddhist, and other metaphysical religious practice, can [the District's] yoga be taught in the public school district?"

[25]   In an amicus curiae brief, the Atlantic Legal Foundation catalogues a list of commonly performed high school sports having religious roots, including track and field, gymnastics, lacrosse, martial arts and basketball.

26

If, on the other hand, the Sedlocks mean that *all* yoga as currently practiced in the United States, is *inherently* religious, we emphatically disagree. A yoga program such as the District's that merely combines physical poses with breathing and quiet contemplation does not comport with any definition of religious activity of which we are aware, including that offered by the Sedlocks. Citing Judge Adams's seminal concurring opinion in *Malnak v. Yogi* (3d Cir. 1979) 592 F.2d 197 (conc. opn. of Adams J.),[26] the Sedlocks contend that there are "three main indicia that determine whether a belief system is a 'religion' or whether aspects of it are 'religious' for First Amendment purposes." The belief system must address "ultimate concerns," it must be "comprehensive," and it may be associated with "formal, external, or surface signs," such as ceremonial functions and clergy. (*Id.* at pp. 208-210.) The District's yoga program is not a belief system of any kind, much less one that addresses "ultimate concerns" such as the "meaning of life and death," and "man's role in the Universe." (*Id*. at p. 208.) Nor is the District's yoga program comprehensive in the sense of being a "systematic series of answers" to all questions in life. (*Id*. at p. 209) Finally, the District's yoga program does not prescribe ceremonial functions or have a clergy. (*Id*. at p. 210.)

Our conclusion that yoga is not inherently religious is consistent with the only case of which we are aware that has addressed whether a school district's teaching of

---

[26] The definition of religion outlined in Judge Adams's concurrence in *Malnak* has been applied by many courts, including the Ninth Circuit. (See *Alvarado, supra,* 94 F.3d at p. 1229.)

yoga violated the establishment clause of the First Amendment, *Altman v. Bedford Cent. School Dist.* (2d Cir. 2001) 245 F.3d 49 (*Altman*).  In *Altman*, the court described the yoga instruction that students received as follows:

> "In 1998, Fox Lane High's athletic director invited Agia Akal Singh Khalsa, a Sikh minister, to conduct yoga exercises for students in gym class.  Khalsa, who wore a Sikh turban, a traditional Sikh robe, and the beard of a Sikh minister, has a trademark name of 'the Yoga Guy.'  He led the class in breathing and stretching exercises designed to achieve relaxation, followed by 'positive affirmations' such as 'I am happy, I am good.'  He received a small stipend from School District funds for his time and travel."  (*Id*. at p. 60.)

The plaintiffs in *Altman* contended that the use of a Sikh priest to conduct the yoga exercises constituted an endorsement of Eastern religions, in violation of the establishment clause of the First Amendment.  (*Altman, supra*, 245 F.3d at pp. 56, 60.) The district court concluded that the yoga instruction did not violate the First Amendment because " 'although the presenter was dressed in a turban and wore the beard of a Sikh minister, he did not in his yoga exercise presentation advance any religious concepts or ideas.' "  (*Id.* at p. 65.)  The Second Circuit affirmed the district court's conclusion, stating only that it was doing so "substantially for the reasons stated . . . in the district court's opinion."  (*Id*. at p. 80.)  *Altman* supports the conclusion that a yoga program that does not advance religious concepts or ideas does not violate the establishment clause of the First Amendment.

In addition, the record in this case contains abundant evidence that contemporary yoga is commonly practiced in the United States for reasons that are entirely distinct from religious ideology.  Yes! Yoga for Encinitas Students submitted the declaration of Dr. Mark Singleton.  Dr. Singleton has a Ph.D. in divinity from Cambridge University and

28

has studied yoga extensively. Dr. Singleton stated, "[Y]oga as it has developed in the United States in the past 150 years is a distinctly American cultural phenomenon. . . . Many of the elements which contributed to its current form are in no way inherently religious." Yes! Yoga for Encinitas Students also submitted a declaration from Brandon Hartsell, the chair of the board of directors of Yoga Alliance, a nonprofit trade association that supports yoga as a profession. Hartsell stated that the "modern practice of yoga is typically comprised of a physical system of exercises, coupled with breathwork and mindfulness practices, that [are] unconnected to a religious denomination." Attached to Hartsell's declaration is a 2012 study of yoga in the United States based on a representative sample of the adult United States population. The study contains a graph entitled "Top Motivations That Keep Them Practicing Yoga," which reflects that the most common motivations that people gave for practicing yoga included increased flexibility (67.9 percent), stress relief (61.8 percent), and improvement in physical health (60.5 percent). The record also contains numerous newspaper and other media articles describing various types of yoga classes that appear to lack even a hint of religious content.

This evidence is consistent with this court's assessment that contemporary yoga in the United States is ubiquitous in secular culture. (See *Altman v. Bedford Cent. School Dist.* (S.D.N.Y. 1999) 45 F.Supp.2d 368, 385, affd. in part and vacated and revd. in part on other grounds (2d Cir. 2001) 245 F.3d 49 ["yoga practices are widely accepted in the western world, simply for their exercise benefits"].) Thus, while the Sedlocks compare

29

the District's yoga classes to a Roman Catholic mass in arguing that that it would surely violate the establishment clause for a school district to require its students to participate in such a mass, the analogy is inapt because yoga is commonly practiced for secular purposes and, as such, is clearly distinguishable from overtly sectarian activities such as a Catholic mass. (*See Brown, supra*, 27 F.3d at p. 1382 [distinguishing fantasy activities based on witchcraft in school curriculum from "Baptism, communion, and the rosary, [which] are 'overt religious exercises,' performed for sectarian purposes" (italics omitted)].)

The purported inherent religious nature of yoga is the fundamental premise that underlies much of the Sedlocks' appeal. For example, the Sedlocks assert that "yoga is without question a Hindu religious exercise or practice that is simultaneously physical *and* religious." However, for the reasons discussed above, it is clear that while yoga *may* be practiced for religious reasons, it cannot be said to be *inherently* religious or overtly sectarian. It is for this reason that cases cited by the Sedlocks in which the Supreme Court has considered whether a governmental practice was impermissibly religiously coercive are largely inapposite. While we are certainly aware that there "are heightened concerns with protecting freedom of conscience from subtle coercive pressures in the elementary and secondary public schools" (*Lee v. Weisman* (1992) 505 U.S. 577, 592), in the absence of evidence that the District's program advances religion, no religious

30

coercion is present.[27]  ( See *Newdow v. Rio Linda Union School Dist.* (9th Cir. 2010) 597

F.3d 1007, 1019 (*Newdow*) [" 'The indirect coercion analysis discussed in *Lee* . . . simply

is not relevant in cases, like this one, challenging non-religious activities,' " quoting *Myers*

*v. Loudoun County Public Schools* (4th Cir. 1995) 418 F.3d 395, 408].)

In sum, in light of the lack of any evidence that the District's yoga program

advances any religious concepts or ideas, we conclude that a reasonable observer would

not view the program as either advancing or inhibiting religion.

4.      *The District's yoga program does not foster an excessive entanglement with*
        *religion*

In *Roman Catholic Archbishop of Los Angeles v. Superior Court*  (2005) 131

Cal.App.4th 417, 434, the court provided the following overview of the concept of

excessive entanglement:

> " 'Although it is difficult to attach a precise meaning to the word "entanglement," courts
> have found an unconstitutional entanglement with religion in situations where a
> "protracted legal process pit[s] church and state as adversaries" [citation], and where the
> Government is placed in a position of choosing among "competing religious visions."
> [Citation.]' [Citation.] 'Not all entanglements, of course, have the effect of advancing or
> inhibiting religion.  Interaction between church and state is inevitable [citation], and we
> have always tolerated some level of involvement between the two.  Entanglement must be
> "excessive" before it runs afoul of the Establishment Clause.' [Citation.]"

---

27      We emphasize that the fact that the District permitted objecting parents such as the
Sedlocks to have their children opt out of the yoga program is not a factor that we
consider as increasing the program's constitutionality.  (See *Wallace v. Jaffree* (1985) 472
U.S. 38, 61, fn. 51 [concluding statute permitting voluntary school prayer violated
establishment clause and noting " 'The Establishment Clause, unlike the Free Exercise
Clause, does not depend upon any showing of direct governmental compulsion and is
violated by the enactment of laws which establish an official religion whether those laws
operate directly to coerce nonobserving individuals or not' "].)

31

" 'Entanglement is a question of kind and degree' [citation], and this 'prong seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs.' " (*Nurre, supra*, 580 F.3d at p. 1097.)

The Sedlocks' excessive entanglement claim is based on two principal arguments. First, the Sedlocks claim that the manner by which the District exercised control over its yoga teachers and yoga curriculum resulted in excessive entanglement. Second, the Sedlocks claim that the District engaged in a "joint religious venture" with the Foundation. We consider each argument in turn.

The gist of the Sedlocks' first argument is that the District became entangled with religion when it modified its yoga program in response to parental complaints about the purportedly religious elements of that program, and that the need to supervise the implementation of the yoga program in the future will result in continued entanglement. The flaw in this argument is twofold. To begin with, many, if not all, of the changes that the District made to the yoga program throughout 2012 in an attempt to alleviate parental concerns about the purported religious nature of the program changed practices that did not even arguably raise an establishment clause violation. For example, the District eliminated the teaching of Sanskrit names for various yoga poses, yet we see no possible establishment clause violation arising out of the fact that yoga teachers had previously been teaching children the Sanskrit names for yoga poses. While the Sedlocks contend that many Hindus consider Sanskrit a sacred language with each word "encoded with consciousness," there is no evidence that the District's teachers taught children Sanskrit

32

words in an attempt to secretly brainwash their students into adopting a particular religious viewpoint. Thus, the District's acts in removing elements such as teaching the Sanskrit names of yoga poses in order to appease concerned parents did not amount to an entanglement with religion.

Second, even as to those elements that arguably could have raised establishment clause concerns, such as the display of a tree labeled in Sanskrit that described the eight limbs of Ashtanga yoga, the District's prompt action in removing these elements did not cause the District to become entangled in the type of sustained and ongoing interaction that would give rise to an *excessive* entanglement between the District and religion.[28] (See *Vernon v. City of Los Angeles* (9th Cir. 1994) 27 F.3d 1385, 1399 ["entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion"]; accord *Brown, supra*, 27 F.3d at p. 1384 ["one-time review [of school curriculum], which was conducted in response to the complaints of, among others, the Browns, clearly does not cause the School District to become entangled with religion"].)

The Sedlocks' contention that the District will be required to "closely monitor[]" the teaching of yoga in its schools in order to ensure that religious elements are not introduced into the program in the future and that such "surveillance" creates the type of "entanglements that the United States Supreme Court condemned in *Lemon*," is not persuasive. In *Lemon*, the Supreme Court considered the constitutionality of a statute

---

28   It is undisputed that the tree display remained on the wall for at most three days at the beginning of the 2012 school year.

under which a state paid salary supplements to teachers who were employed by a religious organization and were teaching in parochial schools, as long as those teachers taught only courses offered in public schools and used only texts and materials used in public schools. (*Lemon, supra*, 403 U.S. at pp. 607, 615, 619.) The *Lemon* court concluded that an excessive entanglement with religion arose from the statutory scheme because "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected." (*Id*. at p. 619.)

Unlike in *Lemon*, in this case, the yoga teachers are not employed by a religious organization and the classes are taught in public schools. Any monitoring of the yoga teachers to ensure that they do not teach religious concepts would be no greater than the monitoring than would be required to ensure that an ordinary classroom teacher is not inculcating religion in his or her students. (Cf. *Agostini v. Felton* (1997) 521 U.S. 203 [rejecting establishment clause challenge to remedial education program in which public school teachers taught disadvantaged students in parochial schools (*id*. at pp. 208-209) and stating "there is no reason to presume that, simply because she enters a parochial school classroom, a full-time public employee such as a Title I teacher will depart from her assigned duties and instructions and embark on religious indoctrination" (*id*. at p. 226)].)

The Sedlocks' second entanglement argument is that District's relationship with the Foundation resulted in excessive entanglement. "A relationship results in an

excessive entanglement with religion if it requires 'sustained and detailed' interaction between church and State 'for enforcement of statutory or administrative standards." (*Williams v. California* (9th. Cir. 2014) 764 F.3d 1002, 1015-1016.)

As discussed in part III.C.3.b., *ante*, the trial court made detailed findings supported by substantial evidence that the District, alone, was responsible for the curriculum and that the Foundation's involvement in training and certifying the teachers was limited to assisting the District in ensuring that yoga teachers would be proficient in teaching yoga poses to the students. Further, there was no evidence that the Foundation attempted to monitor or influence the yoga program in order to ensure that any purported religious goals were met. While there was evidence that one yoga teacher, Jennifer Brown, may have also worked part time for the Foundation, there was no evidence concerning the nature of her employment with the Foundation or how that employment might serve to entangle the District with religion. In short, the evidence of the interaction between the Foundation and District was strictly that of a passive funder and grant recipient, and in no way reflected an "interference of religious authorities with secular affairs . . . ."[29] (*Nurre, supra*, 580 F.3d at p. 1097.)

---

[29] Miyashiro testified, "Once a grant becomes public funds, it's ours. We're in complete control of that." The Sedlocks have not cited any law or authority to the contrary.

35

D.     *Conclusion*

"When it comes to testing whether words and actions are violative of the Establishment Clause, context is determinative."  (*Newdow*, *supra*, 597 F.3d at p. 1019.) While the practice of yoga may be religious in some contexts, yoga classes as taught in the District are, as the trial court determined, "devoid of any religious, mystical, or spiritual trappings."  Accordingly, we conclude that the trial court properly determined that the District's yoga program does not constitute an establishment of religion in violation of article I, section 4 of the California Constitution.[30]

---

[30]     The Sedlocks also contend that the District's yoga program violates two additional provisions of the California Constitution, namely, the free exercise and no preference provision of article I, section 4 ("[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed"), and the no aid to religion provision of article XVI, section 5 (no "school district . . . shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever").  However, the Sedlocks provide no independent arguments in support of these claims.  Accordingly, for the reasons stated in the text with respect to their establishment clause claim, we reject the Sedlocks' claims under these additional provisions of the California Constitution.

IV.

DISPOSITION

The judgment is affirmed.

_____
AARON, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
HUFFMAN, J.